**TEXAS REVIEW SOCIETY, et al.**

v.

**Dr. William H. CUNNINGHAM, et al.**

**Civ. No. A–86–CA–115.**

United States District Court,
W.D. Texas,
Austin Division.

April 3, 1987.

Susan Dasher, Austin, Tex., for plaintiffs.

Jim Mattox, Atty. Gen. of Texas, Mary Keller, Executive Asst. Atty. Gen., J. Patrick Wiseman, Chief, State and County Affairs, James C. Todd, Fernando C. Gomez, Asst. Attys. Gen., Office of the Atty. Gen., Austin, Tex., for defendants.

## ORDER

NOWLIN, District Judge.

The above-styled case came on for trial before the Court on December 10, 1986. The Court, having considered the evidence and argument presented at the trial, the post-trial briefs submitted by the parties, as well as all of the pleadings on file in this case, enters the following findings of fact and conclusions of law.

## I. INTRODUCTION

Plaintiffs are the publishers of a student newspaper at The University of Texas at Austin (UTA). They have brought suit against the President and Board of Regents of UTA, in their official capacities. The Plaintiffs seek a permanent injunction preventing the Defendants from enforcing a university rule that prohibits the Plaintiffs from personally distributing their newspaper on campus. The suit centers around one small portion of the UTA campus: an area known as the West Mall. Plaintiffs originally brought suit under both the First and Fourteenth Amendments of the U.S. Constitution (and parallel provisions of the Texas Constitution), arguing both that (1) the rule at issue is not a reasonable time, place and manner restriction, and (2) that UTA treats the Texas Review differently than it treats the Daily Texan, a competing student newspaper. At trial, the Plaintiffs abandoned the latter claim, and therefore this suit concerns only First Amendment issues (as well as issues under certain parallel provisions of the Texas Constitution). Thus, the sole question presented by this case is whether the First Amendment of the U.S. Constitution or Article 1, §§ 8 or 27 of the Texas Constitution prohibits UTA from enacting a rule disallowing "solicitation" on the West Mall of the UT campus.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, as the case arises under the Constitution of the United States. The case was tried to the Court, as no party demanded a jury.

## II. FINDINGS OF FACT

A. The following facts are not in genuine dispute or are established by the pleadings or by stipulations or admissions of counsel:

1. The Texas Review Society is a registered student organization as that term is

defined in the Institutional Rules on Student Services and Activities of the University of Texas at Austin, Texas.

2. UTA is a public educational institution organized under the laws of the State of Texas and is a part of the University of Texas System.

3. The Regents of the University of Texas are the duly appointed officers who govern the University of Texas System.

4. The Texas Review Society has a properly authorized organization table located on the West Mall of the University campus. The table is a location from which the Texas Review Society recruits new members and where organization members engage in debate and dialogue with other students.

5. The most popular distribution location (except during registration) for all student organizations at UTA is the West Mall of the UTA campus.

6. The West Mall is an area on the UTA campus bounded on the west by Guadalupe Street, on the north by the Texas Union and the Academic Center, on the east by the Main Building and on the south by Goldsmith Hall and Battle Hall. The West Mall is an area in which student organizations are permitted to maintain tables from which they can distribute literature and engage in dialogue with passersby. Here, students may partake of a genuine marketplace of ideas.

7. The Texas Review Society is a student organization which attempts, through its newspaper, to give expression to conservative political and social thought at the UTA campus. In its own words, the *Review* is "Texas' conservative student journal of opinion." The Texas Review is published, authored and edited by the student members of the Texas Review Society.

8. Student interactions fueled by dialogue with organization members and supported by distribution of The Texas Review at the West Mall organization table location are a source of new membership for the Texas Review Society.

B. From the evidence presented at trial, the Court makes the following additional findings of fact:

1. The Board of Regents of the University of Texas System has declared that

The campuses of the component institution of The University of Texas System are not open for assembly and expression of free speech as are the public streets, sidewalks and parks. The responsibility of the Board of Regents to operate and maintain an effective and efficient system of institutions of higher education requires that the time, place, and manner of the exercise of the right of assembly and free speech on the grounds and in the buildings and facilities of the various component institutions be regulated.

Regents' Rules, Part I, Chapter VI, Sec. 6.1. Pursuant to this decision, the Regents have enacted a rule prohibiting "solicitation" on campus. That rule defines "solicitation" as

the sale or offer for sale of any property or service, whether for immediate or future delivery; the receipt of or request for any gift or contribution; and the request that a vote be cast for or against a candidate, issue, or proposition appearing on the ballot at any election held pursuant to state or federal law.

*Id.* at Sec. 6.11. The rule goes on to state that certain activities are not solicitation. Among those is:

The sale or offer for sale of any newspaper, magazine, or other publications by means of a vending machine in an area designated in advance by the chief administrative officer or his delegate for the conduct of such activity.

*Id.* at Sec. 6.12(1). The rule does not prohibit a student organization from endorsing a candidate for political office, or from giving out information about a candidate.

2. Pursuant to these rules, the administration of UTA has enacted very similar policies regarding the UTA campus. The UTA rules define solicitation identically to the Regents' Rules, contain the same exception for newspapers set out above, and the same policies regarding political candidates. *See* Institutional Rules on Student

Services and Activities, Appendix C, Sec. 10–501(b)(1). Based upon these rules, UTA officials have told the Texas Review Society that on campus, and specifically on the West Mall, its members may not personally hand out copies of the Texas Review which contain paid advertisements.

3. On the West Mall, distribution of periodicals or other literature containing advertising which solicits business for enterprises not affiliated with the University is limited to two areas: 1) the sidewalk beside Guadalupe Street bordering the mall on the west; and, 2) a space in the center of the south end of the Mall, between Goldsmith Hall and Battle Hall, opposite the Academic Center. In these areas, such literature containing solicitation for off-campus enterprises must be distributed from unmanned racks or vending machines.

4. Since at least the time this lawsuit was filed, the Review has contained advertisements. The ads range from solicitations for subscriptions for other conservative journals to ads that simply solicit patronage of a product (*e.g.*, Cody's Nightclub and Coors Beer). The Review usually fills two pages of a twelve-page issue with ads.

5. It has been the Review Society's practice to distribute their newspaper on the West Mall by personally handing out copies of the Review to passersby. The Society does not charge for the paper. During the pendency of this case, the Society has continued to distribute the Review on the West Mall in this manner.[1]

6. The University has interpreted its Rules to allow members of the Texas Review Society to have personal copies of its newspaper at its West Mall organization table. This copy may be shown to other students; but, the University's interpretation of the Rules will not permit the free-of-charge distribution of the Texas Review Society's newspaper from the West Mall organization table location because of the paid advertisements contained therein.

7. The Texas Review attempts to publish approximately six issues every school year. The Review has had a difficult time meeting its financial requirements. The two main sources of income to the Review are donations and advertising revenue. If the Review stopped running ads in order to comply with the solicitation rule, the decrease in income would limit the number of pages and frequency of issues the Review could afford to publish. The Review is free, and the managing editor of the Review testified that the free cost of the paper encourages some students to read the paper who might otherwise not read it.

8. Using the method of handing out the papers to students passing through the West Mall, the Review has been able to "get rid of" up to 100 issues per hour, the managing editor testified. The UTA administration has designated a rack on the West Mall from which the Review could be distributed in compliance with the solicitation rule. *See* Finding of Fact B.3., *supra.* The rack is adjacent to a rack currently used by the Daily Texan, UTA's other student newspaper. The Plaintiffs conducted a "test" of the effect of the University's rule by complying with the rule during two-hour periods on two separate days. On both days the Plaintiffs did not distribute the papers by handing them to passersby, but rather placed them in the designated rack, and referred students who asked for a Review to the rack. On the first day, a Wednesday, the test was run from 1:30 p.m. to 3:30 p.m. During that period, six issues were picked up from the rack. On the second day, a Friday, the test was run from 1:00 p.m. to 3:00 p.m. Only two issues were taken from the rack on that day.

9. The results of Plaintiffs' tests are of dubious value, however, because they were conducted at low traffic times. The Defendants offered testimony that the highest traffic time on the West Mall is between 11:00 a.m. and 1:30 p.m. The Plaintiffs did not dispute these times, and the

---

**1.** This suit was removed from state court on February 24, 1986. Prior to removal the state court entered a temporary restraining order enjoining UTA from prohibiting the Plaintiffs' distribution of the Review in the above-described manner. The parties have operated pursuant to this TRO since the time it was entered, apparently by agreement.

Review's managing editor stated that he did not know what the high traffic times are. Thus, the Court finds that the Plaintiffs' tests are not entitled to great weight.

10. Moreover, it is not clear that Plaintiffs' tests show that the decreased distribution is caused by the university rule. It is possible to conclude from Plaintiffs' tests that many of the issues distributed personally by Review members are not truly desired or read by the recipients. Thus, when no one was handing out copies to passersby, only those truly interested in reading the Review picked up copies from the rack, or inquired at the Review Society table where the Review could be obtained. This conclusion is strengthened by the managing editor's statement that the Review often "get[s] rid of" 100 issues per hour when handing them out. Moreover, the publisher of the Review testified that if the Review was forced to tell those students who asked for a paper at the Review's West Mall table that they had to walk to the rack approximately 75 feet away to get a copy, many would not bother.

11. The Review has experienced theft and/or vandalism of papers when they have left papers unmanned in other areas of campus. Thus, the publisher of the Review testified that he believes that if the Plaintiffs complied with the solicitation rule by placing copies in the designated rack, many issues would be destroyed. There was no evidence that any papers were vandalized during the Plaintiffs' tests. Further, the Court finds unpersuasive Plaintiffs' speculation that papers distributed from unmanned receptacles on the West Mall would be vandalized. As noted, no vandalism occurred during the tests. More importantly, the evidence shows that the West Mall is a heavily populated area of campus, an area, therefore, where vandalism would be unlikely.

12. The Vice-President for Student Affairs of UTA testified that the purpose of the UTA rule is to protect the marketplace of ideas that exists on the West Mall. Thus, the rules limit and/or prevent solicitation which would infringe on this market-

place. The Vice-President testified that the rule is enforced regardless of the content of the subject paper or document, and that the University is unwilling to implement a rule which would require content-based decisions. He stated that a rule that was based on a distinction between the type of ads or the non-commercial speech contained in documents would be problematic because it could lead to a slippery slope, eventually allowing a great deal of advertising on campus. More importantly, such a rule would require content-based decisions, decisions UTA does not wish to make.

13. It is undisputed that UTA's decisions in this case were not made on the basis of the content of the articles in the Texas Review, but rather were based solely upon the fact that the Review contained advertising. The Plaintiffs offered no testimony to the contrary.

14. UTA admitted that the Plaintiffs' conduct on the West Mall in handing out newspapers has not adversely affected the marketplace of ideas that exists on the West Mall. UTA stated that its concern, however, is the cumulative effect of allowing all student organizations to distribute publications containing advertisements on campus, and particularly on the West Mall.

15. There are essentially two choices facing the Review in distributing its paper in compliance with the solicitation rule:

(a) Maintain the ads, and distribute from the designated racks on the West Mall, and city property nearby;

(b) Drop the advertising and distribute hand-to-hand. Without ads the Review could permissibly charge for the paper or solicit donations for the paper.

16. If student organizations were exempted from the solicitation rule, any student organization could distribute commercial information on campus. Many companies ask student organizations to distribute promotional literature for them, and student groups do so off campus. Many companies have contacted UTA in an attempt to gain permission to distribute promotional information on campus during registration periods. These companies include

credit card companies, newspapers soliciting subscriptions, health clubs, and political organizations.

17. There are approximately 600 student organizations at UTA. A rule that allowed student organizations to freely distribute advertising on campus would significantly affect the West Mall area, and would detract from the free marketplace of ideas in that area. UTA's rule that material containing advertising be distributed from unmanned receptacles is directly related to its desire to prevent commercial hawking on campus, and it is a reasonable means of accomplishing that goal.

18. The other student newspaper, the Daily Texan, distributes its papers on the West Mall by placing copies in the designated racks. The Texan distributes approximately 1000 copies per day from that location. The Texan has a daily circulation (Monday through Friday) in excess of 43,000 copies. Copies are distributed on campus free of charge.

## III. CONCLUSIONS OF LAW

As noted at the outset of this opinion, the only issue before the Court is whether the Defendants' rule regarding solicitations as applied to the West Mall, violates the First Amendment to the United States Constitution or Article 1, §§ 8 or 27 of the Texas Constitution. There are no equal protection issues before the Court, as the Plaintiffs abandoned those claims at trial.

### A. *First Amendment*

The First Amendment provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble...." U.S. CONST. amend. I. The First Amendment is binding on the states through application of the Fourteenth Amendment. *Healy v. James*, 408 U.S. 169, 171, 92 S.Ct. 2338, 2341, 33 L.Ed.2d 266 (1972). Although the First Amendment prohibits a state from abridging freedom of speech, the Amendment does not prohibit all regulation of expressive activities. Likewise, although the distribution of a newspaper is protected by the free press and speech provisions of the First Amendment, *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 673 (11th Cir.1984); *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 772 (2d Cir.1984), the Amendment does not prohibit all regulation of distribution. Accordingly, First Amendment rights may be regulated by limitations on the time, place, and manner of their exercise. *E.g., Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). For a time, place and manner restriction to be valid, it must be content-neutral, and must be narrowly tailored to serve a significant governmental interest, providing for ample alternative channels of communication. *Id.* at 647–48, 101 S.Ct. at 2563–64, *quoting Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

■ The extent of the permissible regulation is dependent in part upon the place to be regulated. If the place is one that is a "public forum," then few restrictions on the use of the area will be tolerated. *See e.g., Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The University of Texas System has stated in its Regents' Rules that "the campuses of the component institutions of the University of Texas System are not open for assembly and expression of free speech as are the public streets, sidewalks and parks." Regents' Rules, Part I, Chapter VI, Sec. 6.1. Thus, the Defendants have not created a traditional public forum on the UTA campus. The testimony at trial showed, however, that UTA *has* created a public forum on the West Mall insofar as student organizations are concerned. *See* Finding of Fact A.6., *supra.* This is consistent with the Supreme Court's conclusion in *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), that the "campus of a public university, at least for its students, possesses many characteristics of a public forum." *Id.* at 267 n. 5, 102 S.Ct.

at 273 n. 5. Thus, although the Supreme Court

> has long recognized 'the need for affirming the comprehensive authority of the states and of school officials, consistent with constitutional safeguards, to prescribe and control conduct in the schools' ..., the precedents of th[e] Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.

*Healy v. James,* 408 U.S. at 180, 92 S.Ct. at 2345, *citing Tinker v. Des Moines Independent School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In order to prevail in this case, therefore, the Defendants must show that the rule at issue is a content-neutral rule, narrowly tailored to serve a significant governmental interest, and that it leaves open ample alternative channels for communication. *Heffron,* 452 U.S. at 648, 101 S.Ct. at 2564.

Plaintiffs make much of the fact that some of the advertisements published by the Review are not "pure" commercial speech. This point is not terribly important to the outcome of this case, however. First, Plaintiffs do not deny that some of their ads *are* purely commercial, for example the "Coors" and the "Cody's" ads, appearing in volume 5, number 3, p. 9 and volume 3, number 5, p. 12, respectively. These ads alone would support the University's conclusion that the Review contains advertisements which fall within the definition of solicitation. Moreover, the Plaintiffs do not deny that while some of the "less-than-commercial" ads do attempt to communicate political messages, they nevertheless solicit purchases or donations. *See e.g.,* Hillsdale College ad in volume 5, number 1 at 9; and Gun Control ad in volume 5, number 3 at 11. The question presented by this case is whether or not the university may regulate the distribution of a student newspaper which contains solicitations by third parties. The fact that some of the third parties are soliciting funds for politically oriented essays rather than beer does not alter the fact that solicitation is occurring. On the other hand, the fact that some of the ads are purely commercial does not alter the standard the Court will apply here. The Defendants' rule clearly impacts the Plaintiffs' First Amendment rights to publish non-commercial speech, and whether the rule is permitted by the First Amendment must be judged by the rule set out above. Whether the ads are purely commercial or not does not affect the standard of review applied here.

■ There is no question in this case that the rule at issue is content-neutral. The rule evenhandedly prohibits solicitation on campus. The undisputed testimony at trial also showed that the officials of UTA have not applied the rule in this case based on the content of the Plaintiffs' paper, but rather have focused solely on the fact that the paper contains advertising. The rule has been applied with equal force to the Daily Texan, a student newspaper of opposing political views, which has been required to distribute its papers from an unmanned receptacle on the West Mall. By its terms, the rule would apply to any student organization that wished to distribute a document containing paid advertisements.

There is also little doubt that the rule is intended to serve a significant governmental interest. Supreme Court cases recognize that First Amendment rights must be viewed "in light of the special characteristics of the school environment." *Tinker,* 393 U.S. at 506, 89 S.Ct. at 736. *See also Healy,* 408 U.S. at 180, 92 S.Ct. at 2345; *Widmar,* 454 U.S. at 268 n. 5, 102 S.Ct. at 273 n. 5. As the Court in *Healy* noted, "the college classroom with its surrounding environs is peculiarly the 'marketplace of ideas....'" *Healy,* 408 U.S. at 180, 92 S.Ct. at 2345. The testimony at trial was undisputed that the rule exists in order to protect this marketplace of ideas from pollution by commercial hawking and solicitation. This is consistent with the *Widmar* Court's pronouncement that "a university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campuses and facilities." *Widmar,*

454 U.S. at 268 n. 5, 102 S.Ct. at 273 n. 5. UTA has recognized this, and has implemented section six of its Regents' Rules, noting that

> the responsibility of the Board of Regents to operate and maintain an effective and efficient system of institutions of higher education requires that the time, place, and manner of the exercise of the right of assembly and free speech on the grounds and in the buildings and facilities of the various component institutions be regulated.

Regents' Rules at sec. 6.1. It is clear that the Defendants' interest in protecting the marketplace of ideas and the educational atmosphere on the UTA campus is a valid governmental objective. *Widmar*, 454 U.S. at 268 n. 5, 102 S.Ct. at 273. It is also clear that the rule at issue serves that significant governmental interest. *See* Finding of Fact B.17.

A valid time, place and manner restriction must also be "narrowly tailored" to serve the legitimate governmental interest. *Perry Educational Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Court is of the view that this rule meets that requirement. The Plaintiffs offered no alternative rule which would serve the valid interest of UTA. The only suggested alternative was a rule which would allow all student organizations to distribute paid advertisements. As the Court found in its factual findings, such a rule would not accomplish the goal of protecting the marketplace of ideas on the West Mall. *See* Findings of Fact B.16–17. The Plaintiffs also appeared to suggest that a less restrictive alternative would be an exemption solely for Plaintiffs. This argument took the form of Plaintiffs' insistence that their handing out newspapers had not detracted from the marketplace of ideas on campus. This approach, however, is "too narrow a view of the State's interest." *Heffron*, 452 U.S. at 652, 101 S.Ct. at 2566. The evidence demonstrated that there are over 600 student organizations; if all student organizations were permitted to distribute materials containing ads on the West Mall, the character of the West Mall would be significantly altered. *See* Findings of Fact B.16–17. As the Supreme Court noted in *Heffron*, the Plaintiff in that case had "no special claim to First Amendment protection as compared to that of other [organizations] who also distribute literature and solicit funds." 452 U.S. at 652. Likewise, the Texas Review has no special claim to protection on the West Mall. Whether the rule is tailored to protect the state's interest must be viewed in light of the total impact a student organization exemption would have on the university. *Id.* at 652–53, 101 S.Ct. at 2566. *See also, Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 3070–71, 82 L.Ed.2d 221 (1984). As noted, if the rule did not apply to student organizations, the atmosphere of the West Mall would be detrimentally altered. Findings of Fact B.16–17. It is the Court's view that the rule "responds precisely to the substantive problems which legitimately concern the [University]." *Clark*, 104 S.Ct. at 3071, *quoting City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 2132, 80 L.Ed.2d 772 (1984). The rule is narrowly tailored to serve the legitimate interest of protecting the educational atmosphere on a college campus.

The final element that must be established in order to uphold the validity of a time, place and manner restriction is that the rule provides for ample alternative channels of communication. *Heffron*, 452 U.S. at 654, 101 S.Ct. at 2567. The Court has already found that the rule at issue provides the Plaintiffs with two alternatives:

(1) Remove the advertising and continue the hand-to-hand distribution. The Plaintiffs could legitimately request a fee for the paper, or a donation.

(2) Maintain the ads and distribute the paper from an unmanned receptacle, while keeping a copy of the paper at the organizational table on the West Mall, and referring interested parties to the designated rack.

*See* Findings of Fact B.15 and B.6. The Plaintiffs argue that the first alternative is not reasonable because they depend upon advertising revenue to publish the paper. The evidence showed that without such revenue the paper would have to be published less frequently and would consist of fewer

pages. Finding of Fact B.7. In addition, if the Review Society charged for the paper students would be dissuaded from reading the paper because of the charge. *Id.* This would be aggravated by the fact that the Review's competitor, the Daily Texan, is distributed free of charge. *Id.* at B.17. Thus, although removal of ads would provide the Plaintiffs with an alternative channel of communication, it would detract from their ability to communicate their message.

The second alternative, distributing the paper from unmanned receptacles, is also distasteful to Plaintiffs. Plaintiffs argue that their tests show that distribution in this manner is a much less effective means of disseminating the Review. It is the Court's view, however, that this alternative is reasonable. First, the tests are of dubious probative value. *See* Finding of Fact B.9. Second, the test results may simply be an indication that the Review is not the student newspaper of choice on the UTA campus. The fact that not many people are interested enough in reading the paper to pick it up from a rack does not make this alternative unreasonable. Indeed, the Defendants' evidence showed that the Daily Texan is able to distribute up to 1000 copies per day from the same location, indicating that the distribution point is not unreasonably located. Although the First Amendment protects the Plaintiffs' ability to publish and distribute their paper, it does not guarantee that the paper will be popular, or that their endeavor will be successful. The Plaintiffs are entitled to maintain their organizational table, at which they can engage passersby in debate and discussion, and at which they may display their paper and give instructions that a paper may be obtained a mere 75 feet away. In addition, the fact that Plaintiffs fear vandalism does not make the alternative unreasonable. The Court has already found that the evidence on this point did not show that papers were likely to be vandalized. *See* Finding of Fact B.11. It is the Court's view that the rule without question provides for an ample alternative means of communication.

The Defendants have shown that the solicitation rule is content-neutral, is narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels of communication. The rule is therefore a valid time, place and manner restriction, and does not violate the Plaintiffs' First Amendment rights to freedom of speech or freedom of the press. *Heffron*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64.

■ The Plaintiffs also purport to make an argument that the solicitation rule violates their First Amendment right to freedom of association. The argument appears to be based upon the contention that the solicitation rule will adversely affect the Review's circulation, which in turn will decrease the number of members the Society is able to recruit. This, they argue, abridges their right to association. There is no question that the First Amendment protects the right of individuals to associate to further their political beliefs. Although the First Amendment does not make this explicit, the Supreme Court has long held that the right is implicit in the freedoms of speech, assembly and petition. *Healy*, 408 U.S. at 181, 92 S.Ct. at 2346.

The Court is of the view that Plaintiffs have simply failed to establish that the rule abridges their freedom to associate. There is no evidence that the university has denied the Plaintiffs the use of any facilities or buildings in which they may meet. Moreover, the evidence indicates that the university allows the Plaintiffs to set up a table on the West Mall from which they may recruit members and engage in discussion and debate. More importantly, the Plaintiffs' argument that they would not be able to recruit members if they could not distribute their paper hand-to-hand is based upon an assumption that their tests were accurate reflections of the impact the rule will have on distribution. The Court has already noted that Plaintiffs' test results are not entitled to much weight. Finding of Fact B.9. Particularly as they relate to this issue, the Court finds those results of no value. Plaintiffs offered no evidence of the correlation between distribution of the paper and recruitment of members, except to say that the paper is an important tool in

recruitment. Moreover, the publisher of the Review testified that the type of person who would become a member of the Review Society is also the type of person who would be interested enough in reading Plaintiffs' paper that he would walk to the designated rack to obtain a copy. Thus, the prohibition against hand-to-hand distribution should have no impact upon the recruitment of members.[2] Because the Plaintiffs have utterly failed to carry their burden of persuasion on their claim that the university rule abridges their ability to associate, this claim too must fail.

## B. *Texas Constitutional Claims*

■ Although the Plaintiffs have raised their freedom of speech, freedom of the press and right to association claims under the Texas Constitution as well, they have offered the Court very little case support for their claims. *See* Plaintiffs' Proposed Conclusions of Law 37–38 (citing cases from jurisdictions other than Texas); and Plaintiffs' Supplemental Post-Trial Brief at 8 (offering approximately half a page of discussion). Indeed, neither party has bothered to argue to the Court whether the Texas Constitution provides the same or greater protection as the U.S. Constitution, or what the elements of a claim under Article 1 § 8 or § 27 are. In a case where all parties are represented by counsel, this is a sad state of affairs.

Article 1 § 8 of the Texas Constitution provides, in relevant part:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

TEX. CONST. art. I § 8. Although Plaintiffs argue that this section grants them affirmative rights, as opposed to the merely prohibitive aspects of the First Amendment, they do not make it clear what impact the affirmative nature of the rights is supposed to have in this case. The Court has been unable to find a single Texas case that interprets Article 1 § 8 to be more expansive than the First Amendment. Indeed, in the only cases that even come close to discussing the issue, Texas courts have interpreted the two provisions to be essentially the same, or have applied U.S. Supreme Court First Amendment cases to decide the issue under Article 1 § 8. *See Interstate Circuit, Inc. v. City of Dallas*, 402 S.W.2d 770, 773 (Tex.Civ.App.—Dallas, writ ref'd n.r.e. 1966), *rev'd on other grounds*, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); *Stansbury v. Beckstrom*, 491 S.W.2d 947, 948 (Tex.Civ. App. —Eastland, no writ 1973); *Jones v. Memorial Hospital System*, 677 S.W.2d 221, 224 (Tex.App.—Houston [1st Div.], no writ 1984). It is the Court's view that the courts of Texas treat the provisions of Article 1 § 8 as creating the same rights created by the First Amendment. Because the Plaintiffs have failed to prove a case under the free speech and press provisions of the First Amendment, their claim under Article 1 § 8 must also fail.

Article 1 § 27 of the Texas Constitution provides:

> The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance.

TEX. CONST. art. 1 § 27. Again, the Court is of the view that, based on the lack of Texas authority to the contrary, and the similarity of the provisions, the Courts of Texas would treat Article 1 § 27 as coextensive with the parallel provisions of the First Amendment. The Court has already found that the Plaintiffs have wholly failed to prove a denial of their right to association, and thus any claim under Article 1 § 27 must also fail.

## IV. CONCLUSION

The solicitation rule created by the Regents of the University of Texas System,

---

2. The Court notes that if the Plaintiffs wish to distribute flyers announcing the existence of their organization and its objectives, the solicitation rule would not prevent the distribution. Thus, hand-to-hand distribution of informational material still exists as a means to recruit members.

and adopted by UTA, is a permissible time, place and manner restriction. The rule does not therefore violate the First Amendment rights of the Plaintiffs, nor does it violate their rights under the Texas Constitution. ACCORDINGLY, the Court will enter a judgment this day that Plaintiffs take nothing on their claims against Defendants. The Court need not reach the issue of Plaintiffs' attorneys fees, as Plaintiffs have not prevailed on their claim. *See* 42 U.S.C. § 1988. The parties shall bear their own costs.