**HAYS COUNTY GUARDIAN, et al., Plaintiffs–Appellants,**

v.

**Jerome K. SUPPLE, et al., Defendants–Appellees.**

No. 91–8168.

United States Court of Appeals, Fifth Circuit.

Aug. 10, 1992.

Rehearing and Rehearing En Banc Denied Sept. 4, 1992.

J. Patrick Wiseman, Richards, Wiseman & Durst, Austin, Tex., for plaintiffs-appellants.

David W. Williams, Asst. Atty. Gen., Gen. Lit. Div., Austin, Tex., for defendants-appellees.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

*Hays County Guardian,* a newspaper, and students currently enrolled at Southwest Texas State University contend that University regulations unconstitutionally restrict distribution of the *Guardian* on campus. Plaintiffs also contend that the University has granted an inadequately fettered license to its officials to regulate activity protected under the First Amendment and that the University's use of mandatory student fees to finance a student-run newspaper violates the First Amendment.

We find that plaintiffs' objections to official discretion and university funding of the university paper are meritless, but we conclude that the University's regulations against on-campus solicitation unconstitutionally restrict the distribution of the *Guardian.* We affirm the remand to state court of state-law claims. Finally, we find that defendants in their individual capacity enjoy qualified immunity to any damages or attorney's fees that might be awarded in the federal suit.

### I.

The *Hays County Guardian* and students filed this action in Texas state court against various officials of Southwest Tex-as State University and the Board of Regents of the Texas State University System in their official and individual capacities.[1] Plaintiffs alleged that defendants violated their right to equal protection of the laws and to free speech under both the Texas and U.S. Constitutions, later adding claims under the Sherman Anti–Trust Act, 15 U.S.C. § 1 et seq., the Texas Constitution, the Texas Free Enterprise and Anti–Trust Act of 1983, and the Texas Civil Practice and Remedies Code, §§ 104.002–003. Plaintiffs sought monetary, injunctive, and declaratory relief.

Defendants removed the case to federal district court. In its final amended judgment following a bench trial, the district court remanded all state-law claims to Texas state court and held that plaintiffs should take nothing on all remaining claims. Plaintiffs argue here that the district court erred in dismissing the constitutional claims and in remanding the state-law claims to state court.

The *Hays County Guardian* is a small local newspaper, founded in 1989, concentrating on "environmental, peace, and social justice issues." Distributed free of charge throughout Hays County, its publication expense was covered by donations and revenue from advertising by local businesses.

Southwest Texas State University is a Texas state university located in San Marcos, Texas with approximately 22,000 students. 5,000 students live on campus.

The University allows students to participate in a broad range of expressive activities on campus. Board of Regents rules provide that "[a]ny group or person ... may assemble and engage in free speech activities on the grounds of the campus." The University's Operating Letter Number 9.06 also allows students to "publicly distribute outdoors, on grounds owned or controlled by the University, ... pieces of literature that are not obscene, vulgar, or

---

1. The original defendants included the Texas State University System Board of Regents and Southwest Texas State University. On the plaintiffs' motion, the federal district court remanded all claims against these two defendants to Texas state court. Appellants do not seek a reversal of dismissal.

libelous, or that do not contain impermissible solicitation." One part of the campus, a plaza between several University buildings known as the Quad, has been designated by the University as a "free expression area" and can be reserved by students for demonstrations and "symbolic structures." Students may hand out pamphlets, newspapers, and any other literature without advertisements throughout the outdoor areas of the campus.

This general policy of openness to expressive activity is qualified by the University's limits on commercial solicitation. Both the written regulations of the Board of Regents and the University's Operating Letter 9.05 generally prohibit "solicitation" on campus. "Solicitation" is defined as "the sale or offer for sale of any property or service" or "receipt on request for any gift or contribution." Before August 31, 1989, the University did not apply its solicitation restrictions to newspapers that were distributed free of charge, even if those newspapers contained advertisements. On August 31, the Dean of Students instructed the University's counsel to revise the University's "Operating Letter 9.05" concerning solicitation so that free newspapers containing advertisements would be treated as prohibited solicitation.

Board of Regents policy prohibiting solicitation has three relevant exceptions. First, the University permits the sale of "any newspaper, magazine, or other publications by means of a vending machine or distribution stand in an area designated in advance by the President [of the University]." At the time of trial, there were a total of 48 newsstands at five locations on campus.

Second, the University permits "activities ... sponsored by a registered student organization ... which are authorized and scheduled in accordance with the facilities use regulations ... as long as all aspects of the activity clearly identify the organization sponsoring the event on all signs, tickets, or literature." According to trial testimony, a registered student organization could distribute a newspaper containing advertisements by setting up a table in the Quad manned at all times by a student. The student must remain behind the table and may not approach others to distribute the paper. Finally, the University permits students to subscribe to periodicals, which may either be sent through the mails or directly delivered to the student on campus.

Newspapers containing commercials may be distributed on campus only through these three methods of distribution. The *University Star*, a University-owned newspaper run by the students in the Journalism Department, is not subject to any of the University's otherwise applicable restrictions, despite the fact that it contains advertisements. Most of the *Star*'s budget derives from advertising revenues, but the *Star* is also funded in part by mandatory student fees. The *Star*'s method of distribution is determined by the *Star*'s staff and the Journalism Department Faculty, who distribute the paper at about forty drop-off sites and newsracks throughout the campus.

The *Guardian* was notified of this new policy on October 10, 1989, when Tom Burdenski, an assistant director of the student center, wrote to the *Guardian* to warn the paper that it had improperly distributed copies of the *Guardian* in "academic departments, inside the student center, and the Quad Area." The letter informed the *Guardian* that "[n]ewspapers may be circulated on campus in one of two ways"— through the covered newsstands at designated locations and through subscriptions "arranged by the university department in advance" that are either directly delivered or sent through the mail. Similar letters were sent to seven other periodicals that had apparently violated the University's newspaper distribution policy.

The *Guardian* published Burdenski's letter in their paper. Despite Burdenski's warning, the *Guardian* continued to deliver its paper on campus. Burdenski sent a second letter repeating the University's restrictions on newspaper distribution and threatening to refer "further violations ... to the University Attorney for appropriate action." The *Guardian*'s advertising rev-

enue dried up, and the newspaper ceased publication.

## II.

The district court found that the rules contained in the Board of Regents' regulations and the University's Operating Letter Number 9.05 did not violate the *Guardian*'s and students' rights under the First Amendment. This conclusion is a mixed question of fact and law that we review *de novo*. *International Society for Krishna Consciousness v. Baton Rouge*, 876 F.2d 494, 496 (5th Cir.1989).

It is undisputed that the speech in question—distribution of a newspaper containing political and social commentary and reportage—is protected speech. *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). There is also no contention that the government must hold open all government-owned or government-controlled property to all forms of speech. *See Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). The parties concede, as they must, that a speaker's right to access government property is determined by the nature of the property or "forum." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

The right of access to government-owned property for expressive activity is greatest when the property is a "public forum." Government property is a "traditional public forum" if the property has traditionally been used by the public for purposes of assembly and debate. *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. at 955. *See also United States v. Kokinda*, 497 U.S. 720, ——, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990). The government may also create public fora on property not traditionally used for public expression by intentionally opening it for public discourse. *International Soc'y for Krishna Consciousness, Inc. v. Lee*, —— U.S. ——, ——, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541 (1992).

The government may designate a forum for the public at-large or only for certain speakers or for the discussion of only certain subjects. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449; *Perry Educ. Ass'n*, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7. In each case, speech for which the forum is designated is afforded protection identical to the protection provided to speakers in a traditional public forum. *Kokinda*, 497 U.S. at ——, 110 S.Ct. at 3119.

Regulation of expressive activity on property that has been made available for public expression is limited. Content-based restrictions must be necessary to serve a compelling state interest and be narrowly drawn to achieve that end. Significantly, even content-neutral restrictions must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Frisby v. Schultz*, 487 U.S. 474, 478–84, 108 S.Ct. 2495, 2499–501, 101 L.Ed.2d 420 (1988); *International Society for Krishna Consciousness*, 876 F.2d at 497.

The government may reasonably limit speech in a non-public forum as long as the limitation is "not an effort to suppress expression because public officials oppose the speaker's view." *International Soc'y for Krishna Consciousness*, 876 F.2d at 494. Even a complete prohibition on speech is permissible if the prohibition is reasonable and content-neutral. *Id.*

## A.

The district court found that the campus of Southwest Texas State University is not a public forum by either tradition or government design. We disagree. The undisputed facts show that the outdoor grounds of the campus such as the sidewalks and plazas are designated public fora for the speech of university students.

The Supreme Court has noted that the "campus of a public university, at least for its students, possesses many characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981). *See also Healy v. James*, 408 U.S. 169, 180, 92 S.Ct.

2338, 2346, 33 L.Ed.2d 266 (1972). Roughly 5,000 students live and work on the campus, making the campus, in the words of the University's own promotional booklet, a "town" of which the resident student will be a "contributing citizen" and "voting member." The campus's function as the site of a community of full-time residents makes it "a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment," *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 651, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981), and suggests an intended role more akin to a public street or park than a non-public forum. *See Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

Southwest Texas State University's written policies further support the conclusion that the University intended the campus to serve as a public forum for its students. The Board of Regents' Rules state that:

"Any group or person, whether or not a student or employee, and whether or not invited by a registered student, faculty, or staff organization, may assemble and engage in free speech activities on the grounds of the campus. However, the University President or an authorized designee may adopt reasonable nondiscriminatory regulations as to time, place, and manner of such activities. The President, or the authorized designee, may prohibit such activities if it is determined, after proper inquiry, that the proposed speech constitutes a clear and present danger to the University's orderly operation as defined in Subsection 4.4 below."

Interpreting this general policy of protecting "free speech activities" on campus, Southwest Texas State University's Operating Letter 9.06, § 2.02 allows any "student or an organization [to] publicly distribute *outdoors, on grounds owned or controlled by the University*, petitions, handbills, or pieces of literature that are not obscene, vulgar, or libelous, or that do not contain impermissible solicitation." (Emphasis added). The University requires only that the literature being distributed "identify the student or organization distributing it" and that the distribution not

interfere with "free and unimpeded flow of pedestrian and vehicular traffic or disturb ... academic, institutional, or other approved activities." The clear implication of the Operating Letter is that the University intends its outdoor grounds to be a forum for student distribution of literature.

Finally, we note that the University authorizes the widespread distribution on campus of the *University Star*, the newspaper owned by Texas Southwest State University and controlled by student editors. The *Star*, like the *Guardian*, carries editorials, news stories, and advertisements.

All of this evidence compels the conclusion that the University deliberately fosters an environment in which students may freely distribute newspapers, pamphlets, and other literature concerning public affairs "outdoors, on grounds owned or controlled by the University," subject to the limits necessary to preserve the academic mission and to maintain order.

██ Defendants argue that the outdoor grounds of the University cannot be a designated public forum, because the University has not allowed unrestricted access to the campus, even by students. Government property, however, does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech.

The Supreme Court has not adopted such circular reasoning. *See Estiverne v. Louisiana State Bar Ass'n*, 863 F.2d 371, 378 n. 9 (5th Cir.1989). Rather, the Court looks to whether the government was motivated by "an affirmative desire," *Cornelius*, 473 U.S. at 805, 105 S.Ct. at 3450, or "express policy," *Id.* 473 U.S. at 802, 105 S.Ct. at 3449, of allowing public discourse on the property in question. Such a general policy of open access does not vanish when the government adopts a specific restriction on

speech, because the government's policy is indicated by its *consistent* practice, not each exceptional regulation that departs from the consistent practice. *Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1017 (D.C.Cir.1988).

The University authorizes students to distribute by hand literature on matters of public concern on the outdoor parts of the campus. Restricting distribution of newspapers with commercials was an anomalous departure from the general policy of protecting speech such as the political reportage and commentary in the *Guardian*. This departure did not alone redefine the forum. We conclude that the district court erred in finding that the university is not a limited public forum, designated for the speech of students.

### B.

 Having found that the University's outdoor premises are a designated public forum, we must ascertain whether the regulations impermissibly restrain free expression. We will assume *arguendo* that prohibiting the handing out of newspapers containing advertisements on campus does not discriminate on the basis of content. Even so, we find that the anti-solicitation regulations cannot be applied to forbid an individual student from handing out a newspaper solely because that paper contains advertisements.

 Even a content-neutral regulation of speech on a public forum must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). A regulation is "narrowly tailored" when it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758. At a minimum, a regulation cannot be nar-

rowly tailored unless the cost to speech is "carefully calculated" and the fit between the burden and the state interest is "reasonable." *Bd. of Trustees of State University of New York v. Fox*, 492 U.S. 469, 481, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989). The government bears the burden of establishing that the regulations are reasonable. *Id.* Even a legitimate government interest cannot justify a restriction if the restriction accomplishes that goal at an inordinate cost to speech.

The University's anti-solicitation provision contained in the University's Operating Letter 9.05 prohibits a student from handing out a free newspaper with advertising on campus unless that student belongs to a registered student group that has agreed to "sponsor" the paper. Even then, the student group sponsoring the paper must distribute the paper only from a manned table and may not hand the paper to passing students. These restrictions do not apply to the *Star* or to any publication without advertising.[2]

This restriction on the distribution of newspapers is not de minimis. It forecloses one medium of distribution for newspapers with commercials—individual students' distribution of unsponsored papers by hand. Registered student groups could "sponsor" papers, a service for which the group would generally demand a fee. However, an individual student volunteer, lacking a student group's sponsorship, is prohibited from handing out free copies of the *Guardian* to other students while on campus.

Moreover, the anti-solicitation policy restricts an individual's ability to hand out political commentary to the passing public. This medium of communication is traditionally afforded great protection under the First Amendment because of its value to "poorly financed causes of little people." *Martin v. Struthers*, 319 U.S. 141, 146, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943). *See also Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938)

**2.** The Dean of Students, Dr. Garrison, agreed at trial that, "if I've got a newspaper that does not contain any advertising in it and I'm a student, I can distribute it anywhere on campus."

(pamphlets and leaflets "have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history attest"). The undisputed testimony was that handing out the *Guardian* on campus was a more effective medium of delivery than distribution through newsstands. Even a content-neutral restriction on such a basic and traditional medium of distribution cannot be justified by trivial gains in convenience or insignificant reductions of litter. *Schneider v. State*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). *See also* Geoffrey Stone, *Content–Neutral Restrictions*, 54 U.Chi.L.Rev. 46, 95 (1987). Of course, the *Guardian* could avoid these restrictions by not printing commercials. Without commercials, however, the *Guardian* could not meet expenses.

The district court found that the restrictions on the *Guardian*'s distribution advanced several interests including preserving the academic environment and security, protecting privacy, traffic control, preserving the campus's appearance, preventing fraud and deception, and eliminating unnecessary expenses.

There is no substantial evidence that a student's handing out of a free student newspaper would affect the University's academic mission or the rate of crime on campus. The handing out of a political newspaper filled with editorials and reportage about matters of public concern is compatible with the University's academic mission.

The University has a legitimate interest in preventing litter, congestion, and invasions of privacy on campus. Handing out a newspaper on campus might increase the risk of litter, cause more congestion, and lead to students approaching other students who do not wish to be approached. However, the burden is on defendants to show affirmatively that their restriction is narrowly tailored to protect the identified interests. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3035; *Multimedia Publications v. Greenville–Spartanburg Airport*, 774 F.Supp. 977, 985 (D.S.C.1991).

Defendants failed to carry this burden. They darkly warn in their brief that, because "approximately fifty papers are distributed [from newsstands on campus]," allowing newspapers to be distributed free of charge on the campus would "seriously impact access to buildings, create an excessive litter problem, and create a bazaar-like atmosphere on campus." This statement about "fifty newspapers," misrepresents the record. There were forty-eight *newsstands*—not newspapers—on the campus at five different locations. Each had newsstands containing the same major Texas and national papers—*USA Today, The New York Times, Wall Street Journal, The Houston Post, San Antonio Light, Dallas Morning News.* There was no evidence that these papers are handed out on campus.

Assuming that the University faced some marginal increase of litter, congestion, and unwelcome advances by over-zealous, newspaper-wielding students, there is no substantial evidence that the anti-solicitation regulations were reasonably well fitted to preventing these ills. If the University wishes to prevent litter, it should prohibit littering. *Schneider v. State*, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). If it wishes to prevent overcrowding, then the University should regulate the time and place of students who hand out papers on the campus to prevent congestion. *Cf. Lee*, — U.S. at —, 112 S.Ct. at 2715 (O'Connor, J., concurring). If the University wants to prevent obstreperous distribution of the papers, then it should forbid students from pressing their publications on unwilling recipients. *Martin v. Struthers*, 319 U.S. 141, 148, 63 S.Ct. 862, 866, 87 L.Ed. 1313 (1943). Prohibiting students from handing out free "unsponsored" newspapers on the grounds that the newspapers include an advertisement, no matter how willing the recipient or how neat and circumspect the distributor, is not a narrow tailoring to protect identified interests.

The speculative nature of the threat from litter and congestion is illustrated by the fact that the University freely allows distribution of publications that do not contain "solicitation," defined as an "offer for

sale of any property or service" or "receipt of or request for any gift or contribution." Students may, in the University's judgment, pass out pamphlets, announcements, artwork, or any other literature not containing commercials without overwhelming the campus with litter or congestion. Allowing the same students to include a single advertisement in identical literature to defray the printing expense would, it is said, impede "access to buildings, create an excessive litter problem, and create a bazaar-like atmosphere on campus." There is no record evidence that publications with commercials create significantly more litter and congestion than publications without. We do not find such a conclusion intuitively obvious.

The University places no restriction on the *University Star*, a paper that contains a greater number and density of advertisements than the *Guardian*.[3] 12,000 copies of each issue of the *Star* were distributed on the campus. This underinclusiveness cuts against the assertion that restricting commercialism on campus was an interest of paramount importance to the University—or at least an interest that required a flat prohibition on an entire medium of distribution. *See The Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 2612–13, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring) (prohibition on mass media that is not applied to other forms of communication, cannot be regarded as protecting interests of highest order, because "it leaves appreciable damage to that supposedly vital interest unprohibited"); *United States v. Gilbert*, 920 F.2d 878, 885 (11th Cir.1991) ("an injunction that prohibits [appellant] from engaging in expressive conduct [on a public forum] that others are free to engage in clearly cannot withstand strict scrutiny").

Aside from litter, congestion, and invasions of privacy, defendants argue that "the restrictions of commercial materials is [sic] necessary to maintain the academic environment," because "unlimited distribution of newspapers, coupons, flyers, and the like throughout campus would create a circus atmosphere, destroying the unique quality of the University campus." We can assume without deciding that the University may have interests sufficient to justify restrictions on commercial speech, because speech that does little more than propose a commercial transaction occupies a subordinate position in the hierarchy of First Amendment values. *Fox*, 492 U.S. at 477–78, 109 S.Ct. at 3032.

However, little follows here from such an assumption, because the *Guardian* is not commercial speech. It is speech about matters of highest public concern—political and economic reform and the local and international environment. The advertisements in the *Guardian* were included to finance the publication. Under such circumstances, commercial speech was inextricably linked to the newspaper's non-commercial speech, making the whole paper non-commercial. *Riley v. National Federation of the Blind*, 487 U.S. 781, 796, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988). If the purpose of the University's regulation is to limit commercial speech, then it is overbroad when applied to newspapers like the *Guardian*. At the same time, commenting on public issues in the context of a commercial transaction does not elevate speech from commercial to political rank. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983).

Defendants emphasize another interest. As the Dean of Students testified, the anti-solicitation policy served to protect the students from "unwarranted hawking [of] every Tupperware salesperson, pots and pans salesman in ... town."

We recognize that government may have an interest in restricting commercial solicitation of passers-by to prevent disruption of traffic and harassment by

---

**3.** The *Guardian* generally contained less than fifteen advertisements of local businesses per eight-page issue. By contrast, the *Star* ran full pages of advertisements containing well over twenty ads from local businesses, not to mention a page of classified advertisements. In addition, the *Star* sometimes included a separate national, full-color insert containing advertisements targeted toward University students.

insistent hawkers. *Soc'y for Krishna Consciousness*, 876 F.2d at 497 (citing *Heffron*, 452 U.S. at 653, 101 S.Ct. at 2567). *See also Lee*, —— U.S. at ——, 112 S.Ct. at 2708–09; *ACORN v. City of Philadelphia*, 798 F.2d 1260, 1269 (9th Cir.1986). *Glover v. Cole*, 762 F.2d 1197, 1202 (4th Cir.1985). Because solicitation requires purchasers or contributors to stop, listen to a sales pitch, and then produce a payment or contribution, it "can prove more disruptive of order and crowd control" than simple distribution of literature. *International Soc'y for Krishna Consciousness*, 876 F.2d at 497. *See also Kokinda*, 497 U.S. at ——, 110 S.Ct. at 3123. Moreover, face-to-face solicitation "presents risks of duress that are an appropriate target of regulation." *Lee*, —— U.S. at ——, 112 S.Ct. at 2708.

Neither of these concerns is implicated by the handing out of a paper *gratis*. The passer-by's response to the distributor of a newspaper is simply to take or reject the paper. She need not stop and disrupt traffic. When the distributor does nothing more than proffer a paper for which no compensation is asked, there is also little risk of fraudulent over-reaching. The need to restrict hawking and sales, therefore, does not justify the restrictions on the *Guardian*. In fact, this court has found restrictions on solicitation narrowly tailored precisely because they did not restrict "oral advocacy, *distribution of literature*, or other forms of communication and expression." *Soc'y for Krishna Consciousness*, 876 F.2d at 498 (emphasis added). *See also Lee*, —— U.S. at ——, 112 S.Ct. at 2723 (O'Connor, J., concurring) (distinguishing solicitation from distribution of literature).

Finally, defendants state that the University has a valid educational interest in protecting the *Star* from competition from other newspapers. According to defendants, this serves "a legitimate state interest—education of the students enrolled in the journalism program."

This argument rests on the assumption that a University may enhance the popularity of its own publication by burdening the distribution of other publications. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976). Proper time, place, and manner requirements "do not discriminate *among speakers* or ideas" and "further an important governmental interest *unrelated to the restriction of communication.*" *Id.* at 18, 96 S.Ct. at 634 (emphasis added). The restriction of newspapers other than the *Star* cannot be justified by the University's desire to curtail the restricted newspapers' popularity.

■ Defendants argue that the University need not give students and non-students equal access to the University campus. This assertion is true. *Perry Educ. Ass'n*, 460 U.S. at 44, 103 S.Ct. at 954. However, plaintiffs do not contest the University's exclusion of non-students from campus. They challenge the anti-solicitation regulation's application to students who wish to distribute the *Guardian* to other students or, for that matter, wish to distribute their *own* paper containing commercials.[4]

In sum, we hold that the University may not enforce its anti-solicitation policy contained in either Operating Letter 9.05 or in applicable rules of the Board of Regents to restrain the distribution of the *Guardian* on the outdoor grounds of the campus. The *Guardian* is entitled to the same access to the University campus given to publications distributed without charge that do not contain commercials. We express no opinion about the constitutionality of other time, place, and manner restrictions.

### III.

■ Plaintiffs also contend that the University's regulations are facially unconstitutional because they bestow unlimited discretion on the Dean of Students to limit the distribution of newspapers on campus.

---

**4.** Several University students have worked on the *Guardian*'s staff as writers.

Plaintiffs point to Section 2.02(a) of Operating Letter 9.05, which provides for the "sale or offer for sale of any newspaper, magazine, or other publication by means of a vending machine or distribution stand in an area designated in advance by the Dean of Students (or designee) for the conduct of such activity."[5] Plaintiffs contend that this discretion to designate areas for newsstands violates the First Amendment. We disagree.

In challenging the discretion given to the Dean of Students in designating newsstands, plaintiffs rely on *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). In *Plain Dealer*, a newspaper challenged facially a municipal ordinance requiring the newspaper to obtain a license annually in order to place a newsstand on city-owned sidewalks. The ordinance delegated to the mayor the decision to grant or deny applications for newsstand permits, but provided no standards to guide the mayor's discretion.

Justice Brennan, writing for four members of the Court, stated that "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Plain Dealer*, 486 U.S. at 759, 108 S.Ct. at 2145. The Court held that the City ordinance was facially unconstitutional, because it gave unbridled discretion to the mayor to deny individual newspapers' applications for newsstand licenses.

The University regulation in this case is distinguishable from the City ordinance in *Plain Dealer*. The City ordinance gave the mayor discretion to "permit[ ] communication by some but not for others": the mayor could grant or deny *individual* publications' applications for a license to erect a newsstand on the sidewalk. It was this ability to discriminate among different publications that "raise[d] the specter of content and viewpoint censorship." *Plain Dealer*, 486 U.S. at 763, 108 S.Ct. at 2147.

By contrast, the Dean's discretion extends only to the initial designation of areas of the campus reserved for newsstands. Once such areas have been designated, the record suggests that any newspaper could place its stand in the area without further approval from the Dean.[6] Because the University regulation provides no opportunity to discriminate among different publications, the Dean's discretion under the regulations does not implicate *Plain Dealer*'s concerns about content discrimination.[7] Plaintiffs' facial attack on the Dean's discretion to designate areas for newsstands is without merit.

### IV.

Plaintiffs contend that the University's funding of the *University Star* with student fees violated their First Amendment right not to subsidize views with which they disagree. We disagree.

---

**5.** The plaintiffs also point to an internal 1977 memo from the Dean of Student Life, Dr. Joseph Belvilaqua, to the Director of Student Development. In this memo, Dr. Belvilaqua states that

"I will ultimately be responsible for making decisions regarding the reasonableness, taste, decency, etc. of such publications [i.e., publications covered by the on-campus solicitation Operating Letter] for distribution on-campus. As you well know, decisions regarding such standards are usually based upon broadly stated regulations; and I will depend on you and the staff members in helping arrive at decisions in approving or disapproving certain items from time to time."

This internal memo, however, says little about the discretion to restrict speech allowed by the University's regulations. The plaintiffs presented no evidence that Dr. Belvilaqua's interpretation of the regulations was ever promulgated or enforced.

**6.** The letters sent to various newspapers warning them not to distribute their papers by hand on campus, state without qualification that "you may place newspaper dispensers in the [designated areas]."

**7.** Each approved location for newsstands was approved for a limited number of stands. If the spaces for stands were exhausted at the approved locations, then the *Guardian* would have to apply for additional space on which to place a stand. However, there is no evidence in this record that the space at the approved locations was inadequate to accommodate the *Guardian*'s stand.

It is well-established that the freedom of speech and association protected by the First Amendment includes the freedom to choose "both what to say and what *not* to say." *Riley v. National Federation for the Blind*, 487 U.S. 781, 797, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (emphasis in original). *See also Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). This right to refrain from speech is violated when the government compels an individual to endorse a belief that she finds repugnant. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943). It also may be violated when the government compels an individual to subsidize "political and ideological purposes," *Lyng v. International Union, United Auto Workers*, 485 U.S. 360, 369, 108 S.Ct. 1184, 1191, 99 L.Ed.2d 380 (1988), with which she disagrees. *Chicago Teachers Union Local No. 1 v. Hudson*, 475 U.S. 292, 301, 106 S.Ct. 1066, 1073, 89 L.Ed.2d 232 (1986); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977).

The government does not, however, violate the First Amendment whenever it forces an individual to subsidize speech. Any such position would implicate many state subsidies for public universities, for free speech is at the heart of teaching and universities by definition support speech—often extremely controversial speech. *See Widmar*, 454 U.S. at 278–79, 102 S.Ct. at 279 (Stevens, J., concurring). Rather, the First Amendment prohibits the government from forcing an individual to contribute to the ideological expression of other private citizens for the purpose of advancing those citizens' ideological biases rather than substantial public interests.

In *Abood*, for instance, the Court upheld state requirements that teachers pay a fee to the union for the purpose of supporting collective bargaining, even though such coerced contribution would have "an impact on [the dissenting teachers'] First Amendment interests." *Abood*, 431 U.S. at 222, 97 S.Ct. at 1793. The Court reasoned that the interference with the employee's freedom to associate was constitutionally justified by "the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Id.*

The lesson of *Abood*, therefore, is that the government may compel an individual to subsidize non-governmental speech when such compulsion accomplishes the "government's vital policy interest." *Lehnert v. Ferris Faculty Ass'n.*, —— U.S. ——, ——, 111 S.Ct. 1950, 1959, 114 L.Ed.2d 572 (1991). *See Carroll v. Blinken*, 957 F.2d 991, 997 (2d Cir.1992) (citing cases). The question here is whether a University-sponsored newspaper advances an important educational purpose in a narrowly tailored manner.

We find the University's educational goals sufficiently weighty to justify the University's subsidy of a student-run newspaper. Such a newspaper allows students to have first-hand journalism experience difficult to obtain otherwise. It also creates a forum for public discussion of University-related issues that can "stimulate uninhibited and vigorous discussion on matters of campus and public concern." *Carroll*, 957 F.2d at 1000. The *University Star* "increases the overall exchange of information, ideas, and opinions on the campus," *Kania v. Fordham*, 702 F.2d 475, 480 (4th Cit.1983), and thus advances a central purpose of the University. *Carroll*, 957 F.2d at 1001. *See also Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (noting importance of robust debate to University).

We also find that the University's financial support for the student-run newspaper is a narrowly tailored means of advancing these interests. The record indicates that the University did not attempt to control the viewpoints expressed by the newspaper and that there were no ideological prerequisites for joining the paper's staff. The University provided the students with the funds needed for the students themselves to engage in debate and did not force ideological conformity. This method of creating a forum for student expression is a minimally restrictive means of advancing

an educational interest. *Kania,* 702 F.2d at 480 (upholding university financing of student newspaper through mandatory fees); *Veed v. Schwartzkopf,* 353 F.Supp. 149, 152 (D.Neb.1973) (same).

Plaintiffs contend that the University "exercises considerable control over the views expressed in the *Star.*" We find no evidence of such control in the record. On the contrary, the record shows that the *Star* attacked the University's administration vigorously, in one cartoon comparing that administration to the South African government. The University appointed a faculty representative from the Journalism Department to assist in the paper's publication, but there is no evidence that the faculty adviser controlled the newspaper's content.

Plaintiffs rely heavily on the Third Circuit's opinion in *Galda v. Rutgers University,* 772 F.2d 1060 (3d Cir.1985), in which the court held that Rutgers University could not subsidize the New Jersey Public Interest Research Group with mandatory student fees. *Galda* has little relevance to this case. First, we note that the Second Circuit has rejected *Galda. Carroll v. Blinken,* 957 F.2d 991, 1001 (2d Cir.1992) (holding that State University of New York can subsidize New York Public Interest Research Group's on-campus activities with mandatory student fees).

Second, *Galda* is distinguishable from this case. *Galda* is explicitly limited to mandatory fees used to finance "an independent outside organization that espouses and actively promotes a political and ideological philosophy." *Galda,* 772 F.2d at 1064. The court noted that "there is a distinction between PIRG and student organizations ... funded through the student activity fee" because the latter provided a forum for University students to engage in "the expression of differing views." *Id.* (quotations omitted). By contrast, PIRG's purpose was not to provide students with a forum for expression but rather to advance a particular political agenda both on and off campus.

## V.

In its final judgment, the district court held that the Eleventh Amendment, as interpreted by *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), barred it from considering plaintiffs' state-law claims for monetary relief. The district court was also "persuaded that these claims should be remanded rather than dismissed to avoid any limitations problems." The district court, therefore, remanded the state-law damages claims to state court.

■ Plaintiffs urge that the district court erred in finding that it lacked jurisdiction over the state-law claims. Defendants respond that 28 U.S.C. § 1447(d) bars this court from reviewing the district court's remand of plaintiffs' state-law claims. We find that § 1447(d) presents no bar to our review of the district court's final judgment, including its remand of the state-law claims. We also find, however, no error in the district court's remand of plaintiffs' state-law claims to state court.

28 U.S.C. § 1447(d) provides, in relevant part, that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise...." § 1447(d), however, does not preclude all review of remand orders. Rather, § 1447(d) only bars review of remand orders authorized by 28 U.S.C. § 1447(c). *In re Shell Oil Co.,* 932 F.2d 1518, 1521 (5th Cir.1991). § 1447(c) provides that "[i]f at any time *before final judgment* it appears that the district court lacks subject matter jurisdiction, the case shall be remanded" (emphasis added).

By its terms, the district court's remand in this case did not occur "before final judgment." Rather, the remand was part of the final judgment on the merits. Therefore, the remand was not authorized by § 1447(c) and is not covered by § 1447(d). *In re Carter,* 618 F.2d 1093, 1098–99 (5th Cir.1980), *cert. denied sub nom. Sheet Metal Workers' Int'l Ass'n v. Carter,* 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981) (remand to state court after final judgment not authorized by § 1447(c) and therefore not covered by

§ 1447(d)). *See also* Joan Steinman, *Removal, Remand, and Review in Pendent Claim and Pendent Party Cases,* 41 Vand. L.Rev. 923, 1000–1002 (1988). § 1447(d) presents no bar to our consideration of the district court's remand order.

■ We also find no error in the remand of the state-law claims against defendants in their official capacities. In *Pennhurst,* the Supreme Court held that the Eleventh Amendment bars pendent state-law claims from being brought in federal court against the state. The district court thus lacked jurisdiction to hear the state-law claims against defendants in their official capacity. It properly remanded these claims. *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

■ The Eleventh Amendment does not bar state-law actions against state officials in their individual capacity. *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Spruytte v. Walters,* 753 F.2d 498, 512–13 (6th Cir. 1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986). Nonetheless, once the state-law claims against defendants in their official capacity had been remanded to state court, the district court properly remanded the same state-law individual-capacity claims as well. Under 28 U.S.C. § 1367(c)(4), the district court may decline to exercise supplemental jurisdiction over a claim if, "in exceptional circumstances, there are ... compelling reasons for declining jurisdiction."

We find such "exceptional circumstances" and "compelling reasons" here. Adjudicating state-law claims in federal court while identical claims are pending in state court would be a pointless waste of judicial resources. The district court's decision to dismiss the state-law claims entirely, rather than retain jurisdiction over the individual-capacity claims while the official-capacity claims were being adjudicated in state court, was within the court's discretion under 28 U.S.C. § 1367(c)(4).

## VI.

■ Although we agree with plaintiffs that the university's anti-solicitation policy as applied to newspapers with commercials violated plaintiffs' First Amendment right to free speech, we do not agree that defendants are liable for monetary damages or attorney's fees in their individual capacities. Defendants are protected from such a remedy by their qualified immunity as government officials.

■ A defense of qualified immunity can be overcome only if an objectively reasonable officer would know that his conduct was illegal given the facts available to him at the time of his action and the law that was clearly established at the time of the alleged illegal acts. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The University's Operating Letter 9.05 became effective on January 15, 1988. Shortly before this date, similar University regulations had been upheld by a district court in this circuit. *Texas Review Society v. Cunningham,* 659 F.Supp. 1239 (1987).

The regulations upheld in *Texas Review Society* prohibited students at the University of Texas at Austin from handing out newspapers containing commercials in the area where student organizations maintained tables for distribution of literature. Such newspapers could be distributed only from unmanned newspaper racks. The district court held that these regulations were a narrowly tailored means of protecting the campus "from pollution by commercial hawking and solicitation." *Texas Review Society,* 659 F.Supp. at 1245.

We express no opinion about whether *Texas Review Society* was correctly decided. However, the regulations upheld in *Texas Review Society* were sufficiently similar to the regulations at issue here that it cannot be said that defendants violated clearly established law at the time that they enforced the University's anti-solicitation policy against the *Guardian.*

Therefore, defendants' defense of qualified immunity bars an award of monetary

**126**

damages or attorney's fees against defendants in their individual capacity. *McNamara v. Moody,* 606 F.2d 621, 626–27 (5th Cir.1979). Plaintiffs are entitled to prospective declaratory and injunctive relief barring the enforcement of the University's anti-solicitation policy to restrict the distribution of the *Guardian.* They may also be entitled to an award of attorneys' fees from the University. *Jackson v. Galan,* 868 F.2d 165, 168 (5th Cir.1989).

AFFIRMED in part, REVERSED and REMANDED in part for further proceedings consistent with this opinion.