Jason W. ROBERTS, Plaintiff,

v.

Donald R. HARAGAN, Individually and as President of Texas Tech University, et al., Defendants.

No. Civ.A.5:03–CV–140–C.

United States District Court, N.D. Texas, Lubbock Division.

Sept. 30, 2004.

J. Michael Johnson, Shreveport, LA, Ronnie L. Agnew, Lubbock, TX, Kevin Hayden Theriot, Dacula, GA, for plaintiff.

James Carlton Todd, Attorney General of Texas Capitol Station, Austin, TX, for defendants.

## MEMORANDUM OPINION

CUMMINGS, District Judge.

CAME ON FOR CONSIDERATION the Motion for Summary Judgment and Memorandum in Support, together with Appendix, filed by Plaintiff, JASON W. ROBERTS ("Plaintiff"), on October 31, 2003, and the Motion for Summary Judgment and Brief in Support, together with Appendix, filed by Defendants, DONALD W. HARAGAN et al. ("Defendants" or "the University"), on November 4, 2003. The Court also considered Defendants' and Plaintiff's respective Responses and Briefs in Opposition, both filed on November 14, 2003, and Defendants' and Plaintiff's respective Replies, both filed on December 1, 2003. The Court further considered Defendants' Supplemental Authority in Support of Summary Judgment, filed with this Court on March 12, 2004, and Second Submission of Supplemental Authority, filed on August 19, 2004.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute.[1] At the time of the actions relevant to this case, Plaintiff was a student at Texas Tech University Law School. Plaintiff wanted to deliver a speech and pass out literature on campus in order to express his religious and political views that "homosexuality is a sinful, immoral, and unhealthy lifestyle." [2] The University's prior policy did not require any prior permission for student use of the University's designated "free speech area" located in a gazebo near the student union building. Plaintiff, however, desired to make his speech in another location on the corner of 15th Street and Akron, also near, but across the street from, the student union building. Pursuant to the requirements of the University's policy in effect at the time, Plaintiff submitted a "Grounds Use Request" form to the University's Center for Campus Life at least six days prior to the date on which he desired to speak.[3]

The University's initial response to Plaintiff's application came on May 29, 2003, in the form of a letter e-mailed from Mary Donahue ("Donahue"), Assistant Director of the Center for Campus Life. The e-mail stated that

> The use of University grounds, as stated in the University policy, is encouraged for activities which are intended to serve or benefit the entire University community. It is the view of the committee that your request is the expression of a personal belief and thus, is something more appropriate for the free speech area which is the Gazebo area located

---

1. The Court, by its Order dated August 4, 2003, found that this case was particularly amenable to disposition by way of summary judgment as to the constitutionality of the University's past and present policies. Consequently, the Court requested the parties to agree to stipulated facts on the record. Due to conflicting schedules, the parties were unable to do so. However, the parties raise no disputed fact issues, only issues of law, in their respective motions for summary judgment.

2. Because Defendants have not disputed the basic facts of this case, all facts are derived from Plaintiff's Supplemental Verified Complaint unless otherwise noted.

3. The evidence indicates that Plaintiff submitted his "Grounds Use Request" on May 23, 2003, requesting permission to speak on June 5, 2003. [Defs.' App. to Mot. Summ. J. at 28].

near the corner of 15th Street and Boston.

The e-mail did not deny Plaintiff permission to speak at the time or in the manner he chose, but only in the location he had requested. On Monday, June 2, 2003, as was his right under the policy, Plaintiff exercised his right of appeal of the denial to Gregory Elkins ("Elkins"), Director of the Center for Campus Life. [Defs.' App. to Mot. Summ. J. at 31]. In a phone conversation between Elkins and Plaintiff on June 3, 2003, Elkins agreed to grant Plaintiff's request to speak but requested Plaintiff to change the location for his speech to an area just across the intersection, about 20 feet from his proposed location, to which Plaintiff agreed.[4] [Defs.' App. to Mot. Summ. J. at 32]. The reason articulated by Elkins for the University's request that Plaintiff change his speech location was a concern for "vehicular traffic and safety issues" near a major campus entrance. [Aff. of D. Elkins, Defs.' App. to Mot. Summ. J. at 65]. Plaintiff agreed that the University's reasons for moving the location were reasonable. [Plaintiff's Dep., Defs.' App. to Mot. Summ. J. at 110]. On June 6, 2003, Plaintiff e-mailed Donahue acknowledging that his appeal had been granted, but informing her that, because of a personal matter, he had chosen not to make his speech on the date requested. [Defs.' App. to Mot. Summ. J. at 34].

On June 12, 2003, Plaintiff filed a complaint claiming Defendants' policies restricted his freedom of speech- on the University campus. On August 1, 2003, Defendants amended that part of the University's policy regulating speech on campus that is the subject of Plaintiff's claim. On August 4, 2003, the Court entered an Order suggesting to the parties that this matter could be resolved through motions for summary judgment based on stipulated facts. The Court considered the Joint Status Report filed by the parties on August 13, 2003, and on that same date ordered the parties to file cross-motions for summary judgment. Plaintiff and Defendants filed motions for summary judgment on October 31, 2003, and November 4, 2003, respectively.

## II.

### STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotes omitted).

## III.

### ANALYSIS

■ The University currently operates under a policy that regulates student conduct, including speech-related activities, on campus. Plaintiff requested permission to engage in constitutionally protected speech pursuant to a former version of the policy (the "prior policy"), which has now been superseded by a revised, interim policy (the "interim policy"). Plaintiff brings a suit pursuant to 42 U.S.C. § 1983 in which he complains that the prior policy was unconstitutionally applied to him.[5] In ad-

---

**4.** In his appeal letter, Plaintiff stated his desire to speak on June 4, 2003, instead of on June 5, 2003, as requested in his initial "Grounds Use Request."

**5.** Plaintiff also complains that the prior poli-

dition, Plaintiff complains that the interim policy is facially unconstitutional.

## A. What Kind of Forum is the University Campus?

In order to "ascertain what limits, if any, may be placed on protected speech [the United States Supreme Court has] often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ." *Frisby v. Schultz*, 487 U.S. 474, 479–80, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). Central to the analysis then in this case is the character of a public university campus. As the Supreme Court has noted, "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972) (internal quotations omitted). According to the Supreme Court, it cannot be argued that "either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Although First Amendment rights must always be applied "in light of the special characteristics of the . . . environment in the particular case," and schools are afforded a certain degree of latitude to control conduct on their campuses, the Supreme Court has noted that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy*, 408 U.S. at 180, 92 S.Ct. at 2345 (ellipsis in original; quotation omitted). The precedents of the Supreme Court "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy*, 408 U.S. at 180, 92 S.Ct. at 2346 (internal quotations omitted).

As with any government-owned property, the standard by which the constitutionality of any regulation of free speech and expressive activity on a public university campus must be evaluated "differ[s] depending on the character of the property at issue." *Perry Educ. Ass'n*, 460 U.S. at 44, 103 S.Ct. at 954; *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) ("the extent to which the Government can control access depends on the nature of the relevant forum"). The first task in this Court's analysis must be to determine the character of the University's campus in order to apply the proper standard to its policies regulating speech and their application. Where First Amendment activity is concerned,

---

cy was facially unconstitutional. Although the University no longer operates under the prior policy, the "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n. 10, 102 S.Ct. 1070, 1074 & n. 10, 71 L.Ed.2d 152 (1982) (finding that if mere voluntary cessation made a case moot, "courts would be compelled to leave [a] defendant . . . free to return to his old ways."). Nevertheless, a case may be become moot if subsequent events make it clear that the allegedly wrongful behavior is not likely to recur. *Id.* Because the University has adopted less restrictive interim policies, and was in fact formulating those policies prior to the incident involving Plaintiff, and because there is no indication that the University has any intention of reverting to its former policies, the Court determines that Plaintiff's Motion for Summary Judgment on the issue of the facial constitutionality of the prior policy is moot.

the Supreme Court has adopted "forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. Historically, the Court has characterized government-owned property as one of three categories of forums: (1) the "traditional public forum," (2) the "public forum created by government designation," i.e., the "designated public forum," and (3) the "nonpublic forum." *Id.* at 802, 105 S.Ct. 3439.

A traditional public forum is a place which has " 'immemorially been held in trust for the use of the public, and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55 (internal quotations omitted). Examples of traditional public forums include public streets, sidewalks, and parks.[6] *See United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). In such traditional public forums, the government may never prohibit all expressive activity, and any content-based restrictions will be upheld only if narrowly drawn to accomplish a compelling governmental interest. *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. In addition, the government may enforce time, place, and manner regu-

lations as long as they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

The government may also create a second kind of public forum, commonly referred to as a designated public forum, by intentionally opening a "place or channel of communication," not traditionally considered a public forum, "for use by the public at large for assembly and speech." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Importantly, the government does not create a designated public forum merely by inaction or by permitting limited discourse. *Id.* Rather, to determine whether the government has created such a designated forum, a court must look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum ... [and] examine[ ] the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.* When designating such a forum, the government "is not required to indefinitely retain the open character" of the designated forum. *Id.* However, as long as the government maintains the forum, restrictions on expressive activity in the designated public forum are subject to the same limitations that govern a traditional public forum.[7] *See Interna-*

---

**6.** These three examples of what constitutes a traditional public forum have served as useful guides to countless courts in their discussions of various forums. Defining a term by means of examples is only partly helpful, however. A definition that utilizes principles or functional characteristics to explain a term is often necessary to aid in a more complete understanding. Thus, "a place which has immemorially been held in trust for use of the public" is frequently brought into service as an aid to understanding. As a further aid, this Court finds helpful a distinction drawn by the Supreme Court in *Corneli-*

*us,* where it expressed its reluctance to find a designated public forum where "the principal function of the property would be disrupted by expressive activity." *Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450. The converse of this statement supplies this Court with an equally useful definition of what characterizes a traditional public forum, *viz,* government property whose principal function would *not* be disrupted by expressive activity.

**7.** To reiterate those limitations: (1) prohibiting any content-based restrictions unless narrowly drawn to accomplish a compelling gov-

*tional Soc'y for Krishna Consciousness, Inc. v. Lee ("ISKCON II"),* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).

■■■ All government property that is "not by tradition or designation a forum for public communication" is by default considered to be a "nonpublic forum." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. "[A] forum may be considered *non-public* where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating the government did not intend to create a public forum." *Estiverne v. La. State Bar Ass'n,* 863 F.2d 371, 376 (5th Cir.1989). Where the public university "is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *ISKCON II,* 505 U.S. at 678, 112 S.Ct. at 2705. Rather, in such nonpublic forums, the government may restrict the forum for its intended purposes, communicative or otherwise, as long as the regulations impose reasonable content-based restrictions on speech that are not viewpoint-based. *See Perry,* 460 U.S. at 46, 103 S.Ct. at 955; *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3449.

■ More recently, the Supreme Court has used an additional term, "limited public forum," to indicate forums that are opened for public expression limited to particular groups or to particular topics. *See Good News Club v. Milford Central Sch.,* 533 U.S. 98, 106, 121 S.Ct. 2093, 2100, 150 L.Ed.2d 151 (2001). Confusion has existed over the proper distinction be-

tween the terms "designated public forum" and "limited public forum" in the past. *See Whiteland Woods, L.P. v. Township of W. Whiteland,* 193 F.3d 177, 182 n. 2 (3d Cir.1999); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 964–65 (9th Cir.1999); *Summum v. Callaghan,* 130 F.3d 906, 914–15 (10th Cir.1997). The Fifth Circuit, noting this confusion, has recently stated that "the two terms are not synonymous and should not be used interchangeably." *Chiu v. Plano Indep. Sch. Dist.,* 260 F.3d 330, 345–46 (5th Cir.2001). In *Chiu* the Fifth Circuit further noted that the Supreme Court used the term "limited public forum" to describe forums opened for public expression of particular kinds or by particular groups," or "to describe a type of nonpublic forum of limited open access." *Id.* at 345 n. 10, 346. Of particular significance to the court in *Chiu* was the fact that the Supreme Court applied a reasonableness level of scrutiny to the limited public forum category as opposed to the strict scrutiny it applied to the designated public forum category. *Id.* at 346. Accordingly, this Court recognizes the existence of four categories of forums, two of which are subject to strict scrutiny (traditional public forum and designated forum), and two of which are subject to a reasonableness standard (limited public forum and non-public forum).

■ This Court begins its analysis of the facts of this case by recognizing one axiom: the entire University campus is not a public forum subject to strict scrutiny. That this is true is clear from the Supreme Court's recognition that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry,* 460 U.S. at

---

ernmental interest, and (2) allowing content-neutral time, place, and manner regulations that are narrowly tailored to serve a signifi-

cant government interest and leave open ample alternative channels of communication. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948.

46, 103 S.Ct. at 955 (internal quotations and citation omitted). "Nowhere [have we] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for ... unlimited expressive purposes." *Perry*, 460 U.S. at 44, 103 S.Ct. 948 (internal quotations and citation omitted). Likewise, the Supreme Court has made it clear that

> [p]ublicly owned or operated property does not become a "public forum" simply because members of the public are permitted to come and go at will.... We have regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please ... There is little doubt that in some circumstances the Government may ban the entry on to public property that is not a "public forum" of all persons except those who have legitimate business on the premises. The Government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.

*U.S. v. Grace*, 461 U.S. 171, 177–78, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (internal quotations and citation omitted).

However, this Court must also recognize an equally important axiom: the "campus of a public university, at least for its students, possesses many characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981). "The campus's function as the site of a community of full-time residents makes it 'a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment,' and suggests an intended role more akin to a public street or park than a non-public forum." *See Hays County Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir.1992) (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness ("ISK-CON I")*, 452 U.S. 640, 651, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981), and citing *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). As a community for its students, "[a] campus of a major state university is a microcosm of the [larger] community [outside its boundaries], and, as such, contains a variety of fora," both public and non-public. *Alabama Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1354 (11th Cir.1989) (Tjoflat, CJ, dissenting).

 Taking these two axioms at face value, this Court makes this preliminary assumption about the Texas Tech University campus: to the extent the campus has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective of whether the University has so designated them or not.[8]

---

8. In one sense, these areas might be referred to as traditional public forums. However, there is a sense in which they might more properly be referred to as designated forums nonetheless, because they are part of a campus that neither serves nor is open to the public at large, but which is designated almost exclusively for the use of its students. *See Hays County*, 969 F.2d at 116 (determining that "the outdoor grounds of the campus such as the sidewalks and plazas are designated public fora for the speech of university students"). In this sense, "designated public forum" does not take on its usual meaning of an area that, while not a traditional public forum, has nevertheless been set apart for public use by the "affirmative desire" or "express policy" of the University. *See Cornelius*, 473 U.S. at 802, 805, 105 S.Ct. at 3449–50. Rather, the "designated" character results from the mere fact that the University has "designed" its campus to include areas that "suggest an intended role more akin to a public street or park," i.e., that correspond

These areas comprise the irreducible public forums on the campus. Of course, the University, by express designation, may open up more of the residual campus as public forums for its students, but it can not designate less. Consequently, any restriction of the content of student speech in these areas is subject to the strict scrutiny of the "compelling state interest" standard, and content-neutral restrictions are permissible only if they are reasonable time, place, and manner regulations that are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. This assumption necessarily implies its converse: not all places within the boundaries of the campus are public forums. Those areas not public forums, either by virtue of their correspondence to traditional public forums, or by express designation, are therefore either non-public forums or limited public forums.

Defendants view the University campus, though comparable in many ways to a city as to its students, as nevertheless differing "in significant respects from public forums such as [city] streets or parks or even municipal theaters," and accordingly incapable of being categorized as a traditional public forum. *Id.* (citing *Widmar,* 454 U.S. at 268 n. 5, 102 S.Ct. at 274 n. 5) (quotations omitted). The key distinctions mustered by Defendants in defense of

their argument are that "the city government does not own all the land within the city boundaries," and that "the [U]niversity's mission is education for which its administration retains the authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* at 114 (citing *Widmar,* 454 U.S. at 268 n. 5, 102 S.Ct. at 274 n. 5) (quotations omitted). Defendants argue that these distinctions establish that the University campus, presumably in its entirety, is a limited public forum.[9]

Defendants' distinctions, though valid to a point, fail to account for the Supreme Court's recognition, as noted earlier, that the "campus of a public university, at least for its students, possesses many characteristics of a public forum," *Widmar,* 454 U.S. at 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440, and the Fifth Circuit's observation, also noted earlier, that "[t]he campus's function as the site of a community of full-time residents ... suggests an intended role more akin to a public street or park than a non-public forum," *Hays County,* 969 F.2d at 117. The mere fact that the University owns all the land within its boundaries does nothing to change the equation. First Amendment protections and the requisite forum analysis apply to all government-owned property; and nowhere is it more vital, nor should it be pursued with more vigilance, than on a

directly to their counterpart, traditional public forums outside the campus. *Hays County,* 969 F.2d at 117. In the instant case, the exact terminology is not that important, since the applicable standard by which this Court must judge the University's Policy and actions is the same either way.

9. Defendants actually argue at various points in their Brief that the University campus is a limited designated public forum, a designated public forum, and a limited public forum. [Defs.' Mot. Summ. J. at 14–16]. Given the imprecise or confusing way in which many courts have described or distinguished these

categories, this Court understands Defendants' lack of precision. But this Court cannot issue an order without sufficient clarity regarding the matter. In light of the distinctions noted by the Fifth Circuit in *Chiu* as stated above, and given that Defendants' most consistent usage is that of a limited public forum, and most importantly that Defendants argue that a reasonableness standard should apply, this Court assumes that Defendants' argument is that the campus is a limited public forum subject to a reasonableness standard.

public university campus where government ownership is all-pervasive. The University's interest in an orderly administration of its campus and facilities in order to implement its educational mission does not trump the interest of its students, for whom the University is a community, in having adequate opportunities and venues available for free expression. Indeed, those who govern and administer the University, above all, should most clearly recognize the peculiar importance of the University as a "marketplace of ideas" and should insist that their policies and regulations make adequate provision to that end.

The University obscures this recognition and does harm to that end by its view that the entirety of its campus is a limited public forum subject only to a reasonableness standard.[10] The "all inclusive" nature of the government ownership of the entire University campus does not moot the reality that the campus comprises, at least as to its students, a variety of forums. Neither can the fact that use of the University campus, for most intents and purposes, is "limited" to that of the students and Uni-

versity personnel, lead to the conclusion that it is therefore a "limited public forum" subject only to a reasonableness standard.[11] The University's policy is unconstitutional to the extent it regulates the content of student speech in areas of the campus that are public forums, either by tradition or designation, in order to serve anything less than a compelling interest. In addition, it is unconstitutional to the extent that it imposes on expression in those public forums any content-neutral regulations that serve anything less than a significant interest and that do not provide for adequate alternate venues for that expression. With this understanding clearly in mind, the Court will proceed to its analysis of the University's prior and interim policies.

## B. The University's Prior Policy

■ The facts of this case make it unnecessary to describe the particulars of the University's prior policy in order to determine whether it was unconstitutionally applied to Plaintiff. Despite the fact that the prior policy subjected Plaintiff to going

---

**10.** This Court assumes that the University's view is that the campus should be viewed in its entirety as a limited public forum except for those areas of the campus that have been designated as "free speech" areas under the prior policy and "forum areas" under the interim policy.

**11.** The use of the word "limited" is obviously a significant reason for the confusion that exists over the nature of the campus. Although a campus is "limited," in the general sense of that word, to the use of its students and personnel, this does not reduce it in its entirety to the category of a limited public forum subject to reasonableness standards, wherein the word "limited" has a more technical, legal sense. To conflate the two meanings is to ignore the fact that a university campus is a community in a very real sense to that group of persons to whom its use is "limited," and that as to them it "possesses many characteristics of a public forum."

*Widmar*, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5.

The Eleventh Circuit has tried to solve this difficulty by asserting that, as to those persons for whom "the government has made the property available [i.e., the students], a limited public forum is to be treated as a public forum ... [and] is bound by the same constitutional standards that apply in a traditional public forum contest [i.e., strict scrutiny]," whereas "for all other[s] ... it is treated as a nonpublic forum" subject only to a reasonableness standard. *See Alabama Student Party*, 867 F.2d at 1350. However, the Fifth Circuit's decision in *Chiu* does not provide for a duality of standards within the limited public forum category. The single reasonableness standard applied to limited public forums in *Chiu* makes it impossible for this Court to accept Defendants' argument that this single category may properly apply to the entire University campus.

through the process of applying for permission to speak in his desired location on a campus sidewalk near the student union building, being denied permission to speak where he wished, and having to appeal that decision, the bottom line remains that the University never ultimately denied him permission to engage in constitutionally protected speech on campus. The University neither prevented Plaintiff from speaking in the public forum where he wished to speak on the day he chose for his speech, nor did it punish him or threaten him with punishment for making a speech on campus. Rather, Plaintiff agreed to the University's request that he move his speech to an alternate but nearby location still within the public forum.[12]

Moreover, the reason for the University's request that Plaintiff change the location of his speech by approximately twenty feet was a legitimate, viewpoint-neutral, location consideration that was narrowly tailored to meet a significant University concern, i.e., "vehicular traffic and safety issues" near a major campus entrance. Most importantly, Plaintiff never in fact made an appearance at that or any other location to engage in his expressive activity. Quite simply, under these facts there was no unconstitutional application of the University's prior policy against Plaintiff. Because there was no act by the University or its employees that ultimately resulted in a violation of Plaintiff's constitutional right to free speech, the question of qualified immunity regarding any University employee is moot. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?"); *Martinez v. Texas Dep't of Criminal Justice,* 300 F.3d 567, 576 (5th Cir.2002) ("A prerequisite to the qualified immunity analysis, then, is that [the plaintiff] must allege and show facts to support every element of [his] claim").

## C. The University's Interim Policy

■ Although the application of the prior policy was not unconstitutionally applied to Plaintiff, and even though this Court has determined that Plaintiff's facial challenge to the prior policy is moot, Plaintiff raises essentially the same facial challenge to the University's interim policy. Because the case raises issues involving freedom of expression, Plaintiff is permitted to make a facial challenge to the interim policy as well. *See Forsyth County, Ga. v. The Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 2400–01, 120 L.Ed.2d 101 (1992) ("It is well established that in the area of freedom of expression an over-

---

12. Although Plaintiff creates some question over whether he actually agreed to change his speech location or perhaps later rescinded that agreement [Plaintiff's Dep., Defs.' App. to Mot. Summ. J. at 110–11], the issue is immaterial to Plaintiff's as-applied challenge to the prior policy. Even if Plaintiff rescinded his agreement to speak in an alternate location, given the fact that he never actually showed up to make his speech, he would lack standing to make such an as-applied challenge. *See United States v. Hays,* 515 U.S. 737, 742–43, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (requiring showing that plaintiff suffered an injury in fact that is both concrete and particularized, and actual or imminent, not conjectural or hypothetical, in order to establish standing); *Ellison v. Connor,* 153 F.3d 247, 254–55 (5th Cir.1998) ("To establish standing to challenge an allegedly unconstitutional policy, as a general matter a plaintiff must submit to the challenged policy"). This Court will not stretch the bounds of the requisite concrete injury that must be shown in order to make an as-applied challenge to include such a case as this where the Plaintiff never actually shows up to exercise the right to speak he claims is so important.

broad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").

Texas Tech University is a state university governed by its board of regents. The Rules and Regulations of the Board of Regents of the Texas Tech University System ("Regents' Rules"), Rule 08.07, adopted on May 11, 2001, governs the use of the University's campus and facilities. That Rule makes the campus and facilities available subject to the following priorities:

a. regular institutional programs;

b. programs sponsored and conducted by the TTU system and/or a component institution(s) academic and administrative departments or organizations which are affiliated with such departments: and

c. activities that have as their purpose, service or benefit to the entire ... TTU system community and that are sponsored by registered student organizations.

Regents' Rule 08.07.1.[13] However, the campus and facilities are not available for use by non-registered student groups or off-campus groups or organizations. Regents' Rule 08.07.2. Furthermore, on-campus distribution of advertising material by students, faculty, staff, and organizations consisting solely of these persons, is permitted as long as it is "within the bounds of good taste." Regents' Rule 08.09.4a.

Pursuant to these Regents' Rules, the president of the University is authorized to approve "the operating policies, procedures, rules, and regulations for the governance of the [University which then] constitute the operating manuals for that institution." Regents' Rule 02.04.2i. The University adopted Operating Policy and Procedure ("OPP") 61.02 on April 21, 2003, addressing the "Use of University Grounds, Facilities, and Amplification Equipment." [14] The provisions of OPP 61.02 are communicated verbatim to the students through the medium of the Student Affairs Handbook. On August 4, 2003, a revised version of the Student Affairs Handbook was issued and posted on the internet ("SAH 2003–2004").[15] This version of the handbook stands as the version under which the University currently operates. Because the handbook is a verbatim rendition of the provisions of the OPP, this Court assumes that SAH 2003–2004 is an accurate statement of the University's interim policy.[16]

The University's interim policy as set forth in SAH 2003–2004, Part VII, provides that the use of University space and facilities is subject to a "General Policy" that states,

---

13. The relevant Regents' Rules are reproduced in Exhibits 1 and 8 of Defendants' Appendix to their Motion for Summary Judgment.

14. The text of OPP 61.02 is reproduced in Exhibit 2 of Defendants' Appendix to their Motion for Summary Judgment.

15. The text of the handbook as revised on August 4, 2003 (SAH 2003–2004) is reproduced in pertinent part in Exhibit 19 of Defendants' Appendix to their Motion for Summary Judgment, at pages 58–61.

16. Defendants did not include in their Appendix a copy of a revised Regents' Rules or OPP and the Court is not certain if such a revised document has been produced. The handbook, however, indicates that, pending finalization of a current revision of the University policies concerning free expression, the regulations as set forth in the handbook will serve as the interim policies in effect. SAH 2003–2004, Part VII.F. The Court must therefore confine itself to determining the constitutionality of the University's interim policy as set forth in SAH 2003–2004 (the handbook as revised August 4, 2003).

The space and facilities of the university are intended primarily for the support of the instructional programs of the institution. Second priority is given to programs sponsored and conducted by university academic and administrative departments or organizations affiliated with those departments. Beyond these two priorities, use of campus space and facilities is permitted and encouraged for activities, which are intended to serve or benefit the university community.

University buildings, grounds or property may not be used by individuals or organizations not connected with the university, with the exception of the use of forum areas for free expression as set forth in Section F below.

SAH 2003–2004, Part VII.A. (the "General Policy").

After designating several specific facilities and areas of the University that are subject to specific limitations or priorities congruent with their intended functions, such as the academic buildings, residence halls, and athletic and recreational facilities, *id.* at Part VII.D,[17] the University's interim policy designates several other areas, identified as "forum areas," where unrestricted student expression is allowed on a "first-come, first-served" basis.[18] SAH 2003–2004, Part VII.F.1. (the "Designated Forum Area section"). No permission is required for student expression in

the forum areas. *Id.* Requests for permission to engage in "free expression activities" outside the forum areas must be made at least two business days prior to the date of the requested activity. SAH 2003–2004, Part VII.F.2. (the "Prior Permission section"). Requests are to be submitted to the Center for Campus Life, the director or designee of which "will review the request only for noncontent-based criteria" and issue a response within two business days. *Id.* Denials of requests "will be accompanied by a written explanation of any noncontent-based reasons" for the denial, and denials "may be appealed to the vice president for Student Affairs, or his designee, who will provide a written final decision for noncontent-based criteria no later than two business days after the appeal is filed." *Id.*

Students who engage in free expression on campus may be subject to discipline for

[a]ctivities that include, but are not limited to, physical, verbal, written or electronically transmitted threats, insults, epithets, ridicule or personal attacks or the categories of sexually harassing speech set forth in the Code of Student Conduct that . . . [a]re personally directed at one or more specific individuals based on the individual's appearance, personal characteristics or group membership, including, but not limited to, race, color, religion, national origin, gender, age, disability, citizenship, veteran

---

17. Under the Court's analysis, these areas designated for specific uses may properly be described as limited public forums.

18. According to the handbook that reflected the prior policy, the University permitted unrestricted student expression only in the Gazebo, a free-standing structure of approximately 400 square feet adjacent to the Student Union building. Under the interim policies subsequently promulgated by the University, that one free-speech zone was expanded to include additional, greatly enlarged areas of

the campus. In addition to the Gazebo, what are now identified as "forum areas" for free expression include: a) the northernmost one-third of the Engineering Key; b) the northeast side of the Student Union building; c) the southernmost one-third of the plaza between the Student Union building and the Library; d) the western one-half of the courtyard between the Jerry S. Rawls College of Business Administration building and the Architecture building; and e) Amphitheatre of Urbanovsky Park. SAH 2003–2004, Part VII.F.1.

status, sexual orientation, ideology, political view or political affiliation; and ... [a]re sufficiently severe or pervasive to create an objectively hostile environment for that individual by interfering with or diminishing his or her ability to participate in, or benefit from, services, activities or privileges provided by the university.

*Id.* at Part VII.F.3.f. (the "Speech Code"). However, "[t]o make an argument for or against the substance of any political, religious, philosophical, ideological or academic idea is not harassment, even if some listeners are offended by the argument or idea." *Id.*

Lastly, the interim policy permits distribution of printed materials as follows:

Students and registered student organizations do not need prior approval concerning the content or distribution of such materials as leaflets and handbill. However, students may be required to provide student identification upon request. The director of the Center for Campus Life may impose restriction on the time, place and manner for distribution of printed materials, except for those distributed in the forum areas. The materials, however, may not conflict with the provisions of the *Code of Student Conduct* and must comply with all applicable local, state, and federal laws.

Part VIII.E.2 (the "Printed Materials" section).

### 1. The General Policy

■ Plaintiff contends that the General Policy that prioritizes use of the campus space or facilities according to whether that use will "serve or benefit the entire university community" is an unconstitutional content-based restriction on free expression in the campus's public forums. The University contends that the General Policy provision for granting use of the

campus based on whether the use will "serve or benefit the entire university community" is not a ground for prohibiting speech on campus, but rather a legitimate "time, place, and manner" regulation for the purpose of prioritizing uses of the campus.

■ Content-based restrictions are presumptively invalid. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Regulations that "by their terms distinguish favored speech from disfavored speech on the basis of ideas or views expressed are content based." *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 643, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). "Thus, a rule that is applied because of disagreement with a message presented or a rule that has a substantial risk of eliminating certain ideas or viewpoints from public dialogue are content-based." *Horton v. City of Houston, Tex.,* 179 F.3d 188, 193 (5th Cir.1999). "[E]ven if a regulation has an incidental effect on some speakers or messages but not others, the regulation is content neutral if it can be justified without reference to the content of the expression." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 294, 120 S.Ct. 1382, 1393, 146 L.Ed.2d 265 (2000) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). Finally, "government regulations that apply evenhandedly to all speakers weigh in favor of finding content-neutrality." *Horton,* 179 F.3d at 193.

Even if the General Policy is only a means for prioritizing use of the campus, such a regulation could not be applied to an expressive activity without necessarily referencing the content of the expression in order to determine which use is more beneficial. A determination of whether a particular expressive activity will "serve or benefit the entire university community" is

impossible without making a value judgment regarding the content of the expression. *See Shamloo v. Mississippi State Bd. of Trustees of Inst. of Higher Learning*, 620 F.2d 516, 523 (5th Cir.1980) ("Limiting approval of activities only to those of a 'wholesome' nature is a regulation of content as opposed to a regulation of time, place, and manner"). Speakers whose content is not considered sufficiently beneficial can not expect to be treated evenhandedly when decisions on priority use are made.

Nevertheless, although the University did not argue any reasonable saving construction of the General Policy in order to survive the facial challenge, this Court finds that one is available within the words of the interim policy itself and accordingly chooses to take advantage of it. *See Harman v. Forssenius*, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965) (allowing for a federal court to abstain from declaring a statute unconstitutional where it is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question."). Because the Designated Forum Area section imposes no reservation or permission requirement for use of the free expression forum areas, the General Policy's priority determinations based on the relative benefit of the expression necessarily cannot be applied to it. Absent that application, the Designated Forum Area section does not subject students engaged in expressive activities within those forum areas to any unconstitutional content-based regulation of their activity. In addition, although the Prior Permission section requires that permission be requested prior to engaging in free expression outside the forum areas, that section is clear that permission will not be denied based on the content of the expression.

The Court is of the opinion that the language of the Designated Forum Area section and the Prior Permission section acts as a limiting construction on the reach of the General Policy that prevents its application to those park areas, plazas, sidewalks, and streets of the campus that comprise the irreducible public forums of the campus. Despite the awkwardness of the construction of the interim policy, with section F seemingly subject to the General Policy of Part VII, the Court determines that the language of the Designated Forum Area section (Part VII.F.1) and the Prior Permission section (Part VII.F.2) sufficiently limits the application of the General Policy to the nonpublic forums and limited public forums on campus and thus saves the General Policy (Part VII.A) from being facially unconstitutional.[19]

### 2. The Designated Forum Area and Prior Permission Sections

■■■ This Court finds nothing unconstitutional with regard to Part VII.F.1, the Designated Forum Area section of the interim policy. According to its provisions, student expression in the designated public forums is subject neither to any content restrictions nor to any prior restraints.

---

**19.** Of course, even in the nonpublic forums and limited public forums on campus, the General Policy can not be used to regulate expression based on viewpoint. The University is correct, however, that the General Policy is not unconstitutional to the extent it is a reasonable "time, place and manner" regulation of the subject matter of an expressive activity, but that is true only where it applies to the nonpublic forum and limited forum areas of the campus. Many instances exist in which it might be reasonable for the University to prioritize the use of these areas based on the perceived benefit to the University as a whole as determined by the subject matter of the expression. The Court simply notes in this regard that the General Policy could be more carefully drafted or the structure of Part VII altered in such as way as to make this clearer.

Plaintiff contends, however, that the Prior Permission section, Part VII.F.2, does impose a prior restraint on free expression in areas of the campus that are to be considered public forums. Plaintiff argues that the interim policy acts as an unconstitutional prior restraint on students' free-speech rights because it requires a student to acquire a permit at least two business days before engaging in protected speech on the campus outside of the designated free-speech zones but in areas of the campus that are public forums nonetheless.

A "prior restraint" is any statute, ordinance, or policy that vests an administrative official with discretionary power to control in advance the use of public places for First Amendment activities. *See Kunz v. People of the State of New York*, 340 U.S. 290, 293–94, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951). Although prior restraints are not per se unconstitutional, they bear a heavy presumption against constitutionality and must be carefully scrutinized to guard against the unreasonable curtailment of free expression. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990). To avoid violating free expression, courts have required that a permitting scheme leave relatively little discretion in the hands of public officials regarding whether to grant a permit. *See FW/PBS, Inc.*, 493 U.S. at 225–26, 110 S.Ct. at 605 (1990).

 The Prior Permission section, as previously noted, leaves no discretion to anyone to deny permission based on the content or viewpoint of any expressive activity. The University argues, and the Court agrees, that the Prior Permission section is not a prior restraint. Nevertheless, Plaintiff also argues that the requirement of prior permission burdens more expressive activity than the University has a significant interest in regulating as to time, place, or manner. In particular,

Plaintiff contends that a student would be required to get permission just to deliver a speech to classmates on the way to class if he were outside the designated forum areas but still within the public forum areas of the campus, such as on a campus sidewalk. In response, the University argues that it has a significant interest in preserving an environment suitable for classroom instruction and library study. The University also asserts an interest in knowing what activities are going to occur if for no other reason than to prevent scheduling two activities at the same place and time. In addition, the University considers issues of noise and safety associated with pedestrian and vehicular traffic to be a significant concern.

 "A regulation is 'narrowly tailored' when it does not 'burden more speech than is necessary to further the government's legitimate interests.'" *Hays County*, 969 F.2d at 118 (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758). "Even a legitimate government interest cannot justify a restriction if the restriction accomplishes that goal at an inordinate cost to speech." *Id.* In addition, the government bears the burden of establishing that the regulations meet the applicable standard. *Id.* The University's prior permission requirement is certainly not onerous and may be reasonable when applied to most expressive activities in non-public forums on campus. However, just because the requirement of advance permission is not unreasonably burdensome, the University is not thereby permitted to control such casual conversation and otherwise non-disruptive expressive activity in the public forums on campus. The standard for regulations on expression in public forums is not that they be reasonable, but that they are narrowly tailored to promote a significant governmental interest.

The University has failed to convince this Court that burdening all expressive

activities in public forums with its prior permission requirement is necessary to serve its significant interests, even though the University may indeed have a significant interest in controlling some expressive activities. While true that the University need not adopt the absolutely least restrictive or intrusive means to accomplish its purpose, neither has the University convinced this Court that its significant interests would be achieved less effectively under a more carefully drafted regulation.[20] This Court is of the opinion that the Prior Permission section is not narrowly tailored and therefore it is unconstitutional because it sweeps too broadly in imposing a burden on a substantial amount of expression that does not interfere with any significant interests of the University. Furthermore, the argument that permission-free alternative locations are available in the designated forum areas is unavailing where the regulation burdens free expression without sufficient justification in those other areas that this Court has determined must also be considered the irreducible public forums on the campus. *See Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place").

### 3. *The Speech Code*

Plaintiff contends that the Speech Code ban on insults, epithets, ridicule, or personal attacks is also a content-based restriction, because it is based on the potential reaction to the speech by individuals in the audience. Plaintiff argues that the Speech Code amounts to a content-based restriction on student expression because any regulation that restricts expression "out of concern for its likely communicative impact . . . can not be justified without reference to the content of the regulated speech." *United States v. Eichman*, 496 U.S. 310, 317–18, 110 S.Ct. 2404, 2409, 110 L.Ed.2d 287 (1990). Plaintiff asserts that this attempt to predict the benefit of the speech's content before it occurs carries with it a heavy presumption against constitutionality. Defendants argue, correctly, that the Speech Code does not prohibit speech prospectively but only applies after a student has violated the Speech Code.

In further objecting to the Speech Code, Plaintiff argues alternatively that, even if the Speech Code is a content-neutral regulation, the University only has the right to apply content-neutral restrictions to students' expressive conduct that "materially and substantially interfer[es] with the requirements of appropriate discipline in the operation of the school," *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966), or that "impinge[s] upon the rights of other students," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). Plaintiff insists that the Speech

20. The Court notes that more clarity might result from replacing the term "free expression activity" in the Prior Permission section with a term that more narrowly defines the exact nature of the activity that causes it to implicate a significant University interest, without respect to the expression involved. For the purpose of example only, requiring prior permission for "activities that are promoted in advance, sponsored by a student organization, or expected to draw a crowd of more than 25 people" would implicate the University's significant interest in controlling large gatherings that might disrupt classes, block building access, or create traffic hazards. Permission for activities near intersections or during certain hours in close proximity to academic buildings might also be justified by a significant University interest in assuring safety or an environment conducive to study or teaching.

Code goes further than is permitted on a university campus. *See Shamloo v. Mississippi State Bd. of Trustees*, 620 F.2d 516, 521 (5th Cir.1980) (applying *Burnside* standard to university campuses).

Plaintiff argues that the interim policy is overbroad and therefore facially invalid because it is not narrowly tailored and goes well beyond the University's significant interest in maintaining order on its campus and trespasses on protected student expression. Plaintiff contends that the Speech Code controls speech that may only be potentially disruptive and that "unsubstantiated fear or apprehension" that a student or student group's speech will cause disruption is insufficient to restrict student expression. He argues that there is no basis for concluding that *all* such student expression, however unobtrusive and quiet, will always disrupt the campus or cause someone to feel ridiculed or insulted, citing *Tinker* for the proposition that expression may not be restricted merely to avoid the risk that "[a]ny variation from the majority's opinion may inspire fear[,] ... start an argument, or cause a disturbance." *Tinker*, 393 U.S. at 508, 89 S.Ct. at 737. Plaintiff also considers the Speech Code to be impermissibly vague, not providing students with sufficient notice as to what expression might cause them to run afoul of the Code and causing them to censor themselves in order to avoid such infractions.

The University responds that the purposes served by the Speech Code fall within the scope of the University's legitimate interests and that there is no danger of any substantial effect on expression that is not subject to those legitimate interests. The University contends that any instance of speech that is intended to harass or intimidate others that is constitutionally protected could only comprise a negligible portion of the harassment targeted by the policy. It also charges Plaintiff with failure to produce any example where the University has in fact implemented its policy against students engaged in casual conversations on campus. In response to Plaintiff's claim that the Speech Code is vague, the University counters that it is not required to have standards that are absolutely incapable of any misunderstanding.

"Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court-those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (internal quotations omitted). Because the application of the overbreadth doctrine is "manifestly strong medicine," before a statute or regulation may be invalidated on its face, the overbreadth must be "substantial." *Id.* "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)). The issue for First Amendment purposes is whether the law in question reaches "a substantial amount of constitutionally protected conduct." *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987).

The doctrine of overbreadth, while extremely circumscribed in most applications, is generally afforded a broader ap-

plication where First Amendment rights are involved. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). This is a consequence of the doctrine's concern that much protected speech might suffer a "chilling" effect from a statute's potential application in circumstances beyond those that involve clearly unconstitutional speech or conduct. *See Virginia v. Hicks,* 539 U.S. 113, 124, 123 S.Ct. 2191, 2199, 156 L.Ed.2d 148 (2003). In its application, however, how substantial the overbreadth needs to be is a function of the doctrine's "concern with 'chilling' protected speech," and the degree of substantiality required correspondingly "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2917." "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Hicks,* 539 U.S. at 124, 123 S.Ct. at 2199.

■ The Speech Code that makes up part of the University's interim policy is undeniably regulation that *is* "specifically addressed to speech or to conduct necessarily associated with speech," i.e., "threats, insults, epithets, ridicule, or personal attacks, or the categories of sexually harassing speech." Under these circumstances, this Court's concern for the possible "chilling" effect of such a policy does not attenuate but rather strengthens considerably in favor of applying the overbreadth doctrine. Undeniably, much of the speech it regulates lies outside those categories of constitutionally unprotected speech, such as fighting words, libel, and obscenity, that have been recognized by long-standing jurisprudence. *See Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). This Court is of the opinion that application of the Speech Code to the public forum areas on campus would suppress substantially more than threats, "fighting words," or libelous statements that may be considered constitutionally unprotected speech, to include much speech that, no matter how offensive, is not proscribed by the First Amendment.

Even if this Court were to determine that the Speech Code is not a content-based restriction, but merely a content-neutral time, place, and manner regulation, the University fails to convince this Court how its interests in controlling harassing or insulting student speech is significant enough to justify trespass on students' First Amendment freedom in areas outside of the University's nonpublic forum areas. Students, no less than their counterparts outside the campus, rightly expect to have open to them public forums where their freedom of expression is not unnecessarily discounted in relation to governmental concerns, just because the government places great value on its concerns. The legitimacy of the University's concerns is not an absolute value, but rather it must be weighed relative to the student's rights it would suppress and the need to avoid a chilling effect on freedom of expression. Only then may its significance become apparent. In this Court's opinion, the significance is apparent in venues such as classrooms and other facilities and areas of the campus in which the University's proprietary interests and academic mission are most pronounced. It is in these particular settings that intimidation and the hostile environment it may foster can create barriers to equal access to all the benefits, services, activities, and privileges provided

by the University.[21] That significance is not so apparent in the public forum areas of the campus. At some point, the University's interests must attenuate and the students' interests in having a true public forum open to their free-expression interests must predominate. Therefore, even if the Court were of the opinion that the Speech Code is a content-neutral, time, place, and manner regulation, it would still be compelled to find that it is not justified by a significant interest and would still find it unconstitutional as to the public forum areas of the campus.[22]

### 4. The Printed Materials Section

■ Although the Printed Materials section of the interim policy states that it imposes no time, place, or manner restrictions on distribution of printed materials in the designated forum areas, it necessarily allows such restrictions in the public forums of the campus that are not included in the designated forum areas. The Printed Materials section is therefore unconstitutional for the same reasons stated above in addressing the Prior Permission section, i.e., failure to have regulations that are not narrowly tailored and that therefore sweep too broadly in imposing a burden on those

expressive activities that implicate no significant University interest. Furthermore, the Printed Materials section is constitutionally invalid for the same reasons applicable to the Speech Code above, to the extent it imposes the provisions of the Code of Student Conduct on printed materials distributed in any of the public forums on campus, whether designated forum areas or not.[23]

## IV.

### CONCLUSION

The Court hereby ORDERS that Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part and that Defendants' Motion for Summary Judgment is **GRANTED** in part and **DE-NIED** in part as follows:

1). Plaintiff's requested relief is **DE-NIED** as to all Plaintiff's claims under 42 U.S.C. § 1983 that the University's prior policy was unconstitutionally applied to him, resulting in violations of his rights under the First Amendment to freedom of speech, press, and association, his rights to due process, and equal

---

**21.** The regulation is certainly reasonable in light of the University's mission to educate students who comprise a diverse community. It prevents intimidation and the creation of a hostile environment. It is constructed so as to protect academic inquiry and debate regardless of the viewpoint expressed. In addition, it is a viewpoint-neutral regulation that applies equally to any person who might attempt to engage in such intimidating speech, granting no viewpoint a favored position.

**22.** Because the Court has invalidated the Speech Code on the basis of overbreadth as applied to public forums on campus, it is not necessary to reach the question of vagueness. However, because the Speech Code also implicates nonpublic and limited public forum areas on campus, the Court will state its opinion that it does not find the Speech Code to

be unconstitutionally vague and this Court's opinion herein does not invalidate the Speech Code in any application to those nonpublic areas of the campus.

**23.** Plaintiff also complains that the Regents' Rules requires that literature distributed on campus must be "within the bounds of good taste." REGENTS' RULE 08.09.4(a). The Regents' Rules is clear that this requirement applies only to advertising materials for consumer products or services that are distributed on campus. The Printed Materials section of the SAH 2003–2004 does not contain any such requirement of student-generated, non-advertising printed materials. Consequently, the Court declines to entertain Plaintiff's facial challenge to the extent it implicates Regents' Rule 08.09.4(a).

protection rights, and imposed unconstitutional conditions on him.

2). Plaintiff is **DENIED** declaratory relief in the form of a judgment that the University's interim policy (including the Rules and Regulations of the Board of Regents of the Texas Tech University System and the Operating Policy and Procedure Manual for Texas Tech University) is facially unconstitutional as it is stated in the General Policy (Part VII.A) and the Designated Forum Area section (Part VII.F.1) of the Student Affairs Handbook for 2003–2004.

3). Plaintiff's facial challenge of the prior policy's constitutionality is **DENIED** as moot.

4). Plaintiff is **GRANTED** declaratory relief in the form of a judgment that the University's interim policy (including the Rules and Regulations of the Board of Regents of the Texas Tech University System and the Operating Policy and Procedure Manual for Texas Tech University) is facially unconstitutional as it is stated in the Prior Permission section (Part VII.F.2), the Speech Code (Part VII.F.3.f), and the Printed Materials section (Part VIII.E.2), of the Student Affairs Handbook for 2003–2004, as they pertain to the public forum areas of the University campus.

5). Plaintiff's request for injunctive relief is **GRANTED** and Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf, shall CEASE, DESIST, and REFRAIN from acting under, enforcing, or invoking the authority of the University's interim policy (including the Rules and Regulations of the Board of

Regents of the Texas Tech University System and the Operating Policy and Procedure Manual for Texas Tech University) as stated in the Prior Permission section (Part VII. F.2), the Speech Code (Part VII. F.3.f), and the Printed Materials section (Part VIII.E.2), of the Student Affairs Handbook for 2003–2004, as they pertain to the public forum areas of the University campus.

6). All other relief not herein granted is **DENIED**.

SO ORDERED